[961 NE2d 645, 938 NYS2d 254]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v JAY JO-MAR BRADSHAW, Respondent.

Argued November 16, 2011; decided December 13, 2011

**POINTS OF COUNSEL**

*Charles J. Hynes, District Attorney*, Brooklyn (*Maria Park* and *Leonard Joblove* of counsel), for appellant. I. Defendant's waiver of his right to appeal was valid. (*People v Seaberg*, 74 NY2d 1; *People v Hidalgo*, 91 NY2d 733; *People v Moissett*, 76 NY2d 909; *People v Lopez*, 6 NY3d 248; *People v Prescott*, 66 NY2d 216, 475 US 1150; *People v Kemp*, 94 NY2d 831; *People v Williams*, 36 NY2d 829, 423 US 873; *People v Johnson*, 14 NY3d 483; *People v Ramos*, 7 NY3d 737; *People v Callahan*, 80 NY2d 273.) II. The court was not required to assign a new attorney to defendant in connection with his motion to withdraw the guilty plea. (*Strickland v Washington*, 466 US 668; *People v Caban*, 5 NY3d 143; *People v Friedman*, 39 NY2d 463.)

*Appellate Advocates*, New York City (*Erica Horwitz* and *Lynn W.L. Fahey* of counsel), for respondent. I. The Appellate Division correctly held, based on this Court's settled law, that Mr. Jay Bradshaw's waiver of the right to appeal was not knowing, intelligent and voluntary. (*People v Lopez*, 6 NY3d 248; *People v Seaberg*, 74 NY2d 1; *Johnson v Zerbst*, 304 US 458; *Barker v Wingo*, 407 US 514; *People v Harris*, 61 NY2d 9; *People v*

*Thomas,* 53 NY2d 338; *Carnley v Cochran,* 369 US 506; *People v Muniz,* 91 NY2d 570; *People v Williams,* 36 NY2d 829; *People v Callahan,* 80 NY2d 273.) II. This Court lacks jurisdiction to review the ineffectiveness of counsel claim never determined by the Appellate Division.

## OPINION OF THE COURT

CIPARICK, J.

In *People v Lopez* (6 NY3d 248 [2006]), we emphasized, once again, that "[a] waiver of the right to appeal is effective only so long as the record demonstrates that it was made knowingly, intelligently and voluntarily" (6 NY3d at 256). Applying this standard here, we hold that the record fails to establish that defendant validly waived his right to appeal.

### I.

A Kings County grand jury indicted defendant for rape in the first degree and other related charges for an incident that allegedly occurred in the early morning hours of May 11, 2004 near an apartment complex in Brooklyn. In late June 2004, Supreme Court arraigned defendant on the charges and ordered that he submit to an examination pursuant to article 730 of the Criminal Procedure Law to determine whether he was an "incapacitated person."[1]

Both a psychiatrist and a psychologist separately evaluated defendant in early August 2004 and they each concluded that defendant was unfit to proceed with his case. The psychiatrist specifically noted that defendant "exhibit[ed] signs of regression" and was "clearly incapable presently of assistance in his defense and stands in need of further inpatient psychiatric care." The psychiatrist also commented that despite the seriousness of the charges lodged against defendant, he appeared, at times "quite nonplussed by his predicament." Similarly, the psychologist observed that although she believed that defendant understood more than he acknowledged, defendant could articulate "only a sketchy and inaccurate understanding of the legal process."

On September 9, 2004, Supreme Court signed an order, on motion of defense counsel, adjudicating defendant an

---

1. " 'Incapacitated person' means a defendant who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense" (CPL 730.10 [1]).

incapacitated person and committing him to the custody of the Commissioner of Mental Health. Following his commitment at the Mid-Hudson Forensic Psychiatric Center (Mid-Hudson), defendant was diagnosed with "Adjustment Disorder with Anxiety and depressed mood." Over the next several months, he received extensive treatment, which included medication, individual sessions with his psychiatrists and group therapy. In a report dated March 3, 2005, defendant's psychiatrists determined that he was now competent to return to court, finding improvement in defendant's cognitive function.

Defendant's ability to proceed with his case, however, proved short-lived. In August 2005, at Supreme Court's directive, defendant submitted to a second article 730 examination and was again found unfit to proceed. The same psychiatrist who assessed defendant during the initial article 730 examination opined that "defendant is again, or still, regressed" and seemed "inaccessible" to basic reason. He further remarked that defendant's responses were "of childish quality." Accordingly, in September 2005, Supreme Court signed a second order adjudicating defendant an incapacitated person.

While defendant's treating psychiatrists at Mid-Hudson found him fit to proceed within a month of Supreme Court's commitment order, defendant's case did not move forward in a customary fashion. From December 2005 through February 2006, defendant, who was in custody, missed five scheduled court appearances. Defense counsel explained that defendant had been adjudicated an incapacitated person on a felony matter pending in Queens County and had been committed to the same facility where defendant had been treated in connection with this case.[2]

Defendant finally returned to court in April 2006. Although his case had been adjourned for possible disposition over the course of that month and into May, Supreme Court ordered a third article 730 examination of defendant on May 30, 2006. A different psychiatrist and psychologist examined defendant and while they determined he was fit to proceed, the psychologist stressed that defendant was "in need of a good deal of support by defense counsel, in order to explain the complexity of this case and how it relates to outcomes or plea offers in the other two cases."

---

2. On a subsequent court date in May 2006, Supreme Court was also informed that defendant had a case pending in Bronx County and an article 730 examination had been ordered there as well.

From August to November 2006, defendant appeared in court on four occasions. Throughout this period, the parties advised Supreme Court that the trial courts in the Bronx and in Queens had decided to hold hearings in order to determine defendant's fitness to proceed with his cases pending in those counties. When defendant returned to court on December 11, 2006 on the instant matter, the hearings in Bronx and Queens Counties had not been completed. In any event, Supreme Court ordered defendant to submit to a fourth article 730 examination on that day.

Following defendant's February 2007 examination, he was found fit to proceed. The psychologist who evaluated defendant at this time did comment, however, that while defendant was "able to discuss [his cases] and consider his options . . . effective and consistent psychiatric treatment is paramount in maintaining [his] stability and competence." On February 26, 2007, defendant initially contested the results of this examination and requested a hearing on the matter. Approximately three weeks later, defendant withdrew his request for a hearing and Supreme Court confirmed the results.

In the 12 months that ensued, the parties conducted plea negotiations and apprised the court on the status of defendant's other open cases. Finally, on February 5, 2008, Supreme Court presided over a suppression hearing to determine the admissibility of certain identification testimony. After the hearing, the court denied defendant's suppression motion, concluding that the People could introduce complainant's identification of defendant in a lineup at trial.

The next day, defendant pleaded guilty to first-degree rape in exchange for a promised determinate sentence of nine years imprisonment followed by five years postrelease supervision. The record reveals that Supreme Court only made fleeting references to defendant's appeal waiver. At the outset of the proceeding, the court enumerated the conditions of the guilty plea, including defendant's waiver of his right to appeal. The court briefly outlined that an appeal waiver "means, the conviction here is final, that there is not a higher court you can take [the case] to." When Supreme Court inquired whether defendant understood, defendant only asked the court to clarify its explanation of the mandatory fees associated with his guilty plea. Supreme Court neither confirmed whether defendant comprehended its terse explanation of the nature of the appeal waiver nor did it mention that defendant possessed an inherent right to appeal a judgment of conviction and sentence.

After Supreme Court ascertained that defendant spoke English, it addressed defendant's previous confinement for "mental illness" and questioned whether defendant felt "well today, psychologically." Defendant responded, "Yes." The court also received assurance from defendant that he had not ingested any alcohol or controlled substances impairing his ability to understand these proceedings. The court further explained the rights associated with a jury trial and that defendant's decision to plead guilty would extinguish this right. Defendant acknowledged that he understood this right that he was forgoing.[3]

Next, the court inquired, "other than what I have already promised you, which is the nine years[ imprisonment], five years postrelease supervision, waiver of [the] right to appeal, and $270 in fees and fines, has anybody else made any other promise to you in order to get you to plead guilty?" Defendant said, "No" and further stated he had not been threatened or coerced into pleading guilty. Once defendant allocuted to the first-degree rape charge, the court accepted the plea. Right before it adjourned the case for sentencing, Supreme Court simply asked whether the written waiver of the right to appeal had been signed. Defense counsel affirmed that the form had been executed by defendant in his presence and handed it to the court. The court did not inquire of defendant whether he understood the written waiver or whether he had even read the waiver before signing it.

The written waiver in this case consists of three sections. The first section, signed by defendant, indicates, in part, that "I execute this waiver after being advised by the court and my attorney of the nature of the rights I am giving up." The form further states that "I have been advised of my right to take an appeal [and] to prosecute the appeal as a poor person." The second section, signed by defense counsel, says, in part, that "I represent that prior to the signing of the foregoing waiver, the above-named defendant was fully advised of the rights of a convicted person to take an appeal" in New York. The third section, signed by Supreme Court, states, "[h]aving examined the defendant in open court and on the record, it is the Court's opinion that the defendant has knowingly and freely waived the right to appeal. Waiver is approved."

At sentencing, defendant sought to withdraw his guilty plea. He maintained that his attorney misinformed him about the

3. The court also advised defendant that his guilty plea may subject him to civil confinement pursuant to article 10 of the Mental Hygiene Law.

parameters of the plea and he had actually been promised a "MICA [Mentally Ill/Chemically Addicted] therapeutic program." Supreme Court denied defendant's request to withdraw his guilty plea and sentenced defendant, a first-time felony offender, as promised. In addition, the court imposed a supplemental sex offender fee.[4]

The Appellate Division, with two Justices dissenting, reversed the judgment of conviction and sentence. The court held that defendant's appeal waiver was unenforceable "because . . . Supreme Court provided virtually no explanation regarding the waiver and took no measures to ensure that he, a first-[time] felony offender with a history of mental illness, understood it and was validly waiving his right to appeal" (*People v Bradshaw*, 76 AD3d 566, 568 [2d Dept 2010]). While the majority acknowledged that, in certain instances, "a detailed written waiver can supplement a trial court's on-the-record explanation of what a waiver of the right to appeal entails, and clarify possible ambiguities in that explanation," it concluded, given Supreme Court's "extremely perfunctory" discussion of the waiver, that this was not such a case (*id.* at 569). Having determined that defendant retained his right to appeal the denial of his suppression motion, the court further agreed with defendant that complainant's lineup identification of defendant should have been suppressed since the "hearing record is inadequate to establish that his arrest was supported by probable cause" (*id.* at 570). Finally, the court noted that Supreme Court erred in imposing the supplemental sex offender fee "because the crime was committed prior to the effective date" of the statute providing for such fee (*id.* at 573).

The dissenting Justices would have modified the judgment of conviction and sentence to the extent that it was improper for Supreme Court to impose a supplemental sex offender fee, and, as so modified, would have affirmed (*see id.* at 581). The dissenters, relying on this Court's holding in *People v Ramos* (7 NY3d 737 [2006]), concluded that Supreme Court's colloquy with defendant during the plea proceeding, combined with the executed written waiver form, demonstrated that "defendant effectively waived his right to appeal," foreclosing any "review of the denial of suppression of identification testimony" (*id.* at

---

4. At sentencing, defendant also requested to proceed pro se, expressing discontent with his attorney's representation. Supreme Court sentenced defendant without addressing this issue.

579). Notwithstanding this position, the dissenters also opined that Supreme Court's denial of defendant's suppression motion was appropriate since the hearing record sufficiently established that defendant was in lawful custody at the time that complainant identified him in the lineup (*see id.* at 580-581).

A Justice of the Appellate Division granted the People leave to appeal (15 NY3d 896 [2010]) and we now affirm.

## II.

It is well settled that plea bargaining is "a vital part of our criminal justice system" (*People v Seaberg*, 74 NY2d 1, 7 [1989]). "In addition to permitting a substantial conservation of prosecutorial and judicial resources, it provides a means where, by mutual concessions, the parties may obtain a prompt resolution of criminal proceedings with all the benefits that enure from final disposition" (*id.*). Of course, plea bargaining "necessarily includes the surrender of many guaranteed rights," such as "the right to a jury trial or the privilege against self-incrimination" (*id.*). Citing the United States Supreme Court's decision in *Schick v United States* (195 US 65, 72 [1904]), we observed that absent a constitutional or statutory mandate or public policy considerations, "an accused may waive any right which he or she enjoys" (*id.*). In *Seaberg*, we recognized that in New York an accused's statutory right to an initial appeal (*see* CPL 450.10) is among the rights that may be relinquished (*see id.* at 7-8).

As noted earlier, "[a] waiver of the right to appeal is effective only so long as the record demonstrates that it was made knowingly, intelligently and voluntarily" (*People v Lopez*, 6 NY3d 248, 256 [2006]; *see also People v Calvi*, 89 NY2d 868, 871 [1996]; *People v Callahan*, 80 NY2d 273, 280 [1992]). An appellate waiver meets this standard when a defendant has "a full appreciation of the consequences" of such waiver (*Seaberg*, 74 NY2d at 11). To that end, a defendant must comprehend that an appeal waiver "is separate and distinct from those rights automatically forfeited upon a plea of guilty" (*Lopez*, 6 NY3d at 256).

It is the trial court's responsibility, "in the first instance," to determine "whether a particular [appellate] waiver satisfies these requirements" (*Callahan*, 80 NY2d at 280). After all, the trial court "is in the best position to assess all of the relevant factors" (*id.*) "surrounding the waiver, including the nature and terms of the agreement and the age, experience and *background*

of the accused" (*Seaberg*, 74 NY2d at 11 [emphasis added]). In addition, "though a trial court need not engage in any particular litany" or catechism in satisfying itself that a defendant has entered a knowing, intelligent and voluntary appeal waiver, a trial court "must make certain that a defendant's understanding" of the waiver, along with the other "terms and conditions of a plea agreement is evident on the face of the record" (*Lopez*, 6 NY3d at 256; *see also Callahan*, 80 NY2d at 283 [a valid appeal waiver "cannot be inferred from a silent record"]).

We applied these principles in *People v DeSimone*, a companion case decided in conjunction with our decision in *Callahan*. There, the record established that the defendant signed a written waiver of his right to appeal, although there was no mention of this waiver by the court during the plea proceeding (*see DeSimone*, 80 NY2d at 279). Consequently, we held that "the record simply [did] not afford a sufficient basis for concluding that [the] defendant's waiver of his right to appeal was knowing, intelligent and voluntary" (*id*. at 283). In that regard, we observed that there was not only "no record discussion between the court and [the] defendant concerning the waiver" but there was also no "attempt by the court to ascertain on the record an acknowledgment from [the] defendant that he had, in fact, signed the waiver or that, if he had, he was aware of its contents" (*id*.). We further noted that the court appeared to have "no prior knowledge of the waiver" and was certainly unaware of "the circumstances surrounding the document's [purported] execution" (*id*.).

■ Although the record before us here is not as bleak as the record in *DeSimone*, we likewise conclude it does not sufficiently demonstrate that defendant validly waived his right to appeal because the trial court failed to ensure that defendant grasped the minimal information pertaining to the appeal waiver it provided during the plea colloquy. Following Supreme Court's description of the appeal waiver, it questioned whether defendant comprehended the court's remarks. Defendant answered by simply asking about the mandatory fees associated with his guilty plea. At this juncture, or at least prior to the completion of the plea proceeding, Supreme Court should have assured itself that defendant adequately understood the right that he was forgoing.

The absence of this inquiry is particularly troubling given defendant's background and history of mental illness. In the nearly four years between defendant's indictment and his guilty

plea, Supreme Court ordered, on this case alone, that he submit to four article 730 examinations. Of those four examinations, defendant was found unfit to proceed with his case on two occasions, causing lengthy delays in the case. Indeed, the reports furnished by the mental health professionals painstakingly described defendant's diminished mental capacity. As indicated earlier, they revealed that he was "inaccessible," "regressed" and "nonplussed by his predicament." One psychologist commented that defendant possessed "only a sketchy and inaccurate understanding of the legal process." Even in one of the instances where defendant was competent to proceed with his case, a different psychologist warned that defendant was "in need of a good deal of support by defense counsel, in order to explain the complexity of this case and how it relates to outcomes or plea offers in the other two cases." These circumstances, combined with the knowledge that defendant was a first-time felony offender who had been ordered to submit to article 730 examinations in two other counties, should have alerted the trial court not only to give defendant a thorough explanation of the appeal waiver but also to make sure that defendant fully grasped the nature of this fundamental right that he was forgoing (*see Callahan*, 80 NY2d at 280 ["the trial court . . . is in the best position to assess all of the relevant factors, including . . . the age(,) experience (and background) of the accused"]).

Nevertheless, the People, the dissenting Justices at the Appellate Division and the dissent here espouse that the oral colloquy during the plea proceeding combined with the written waiver mandates a finding that defendant's appeal waiver was effective. To support this position, they heavily rely on our decision in *People v Ramos* (7 NY3d 737 [2006]). We reject this argument and conclude that *Ramos* is distinguishable from the case at bar.

During the plea proceeding in *Ramos*, the trial court stated,

> "you also understand by entering this plea of guilty you're giving up any and all rights to appeal this conviction and sentence; in other words, this is now final. Once you agree to do this, not only will there not be any trial but there won't be any appeals. Do you understand that this is final?"

Defendant Ramos acknowledged that he understood. We held that this oral colloquy, even if it was ambiguous, combined with

the written waiver, which "stated that [the] defendant had the right to appeal, explained the appellate process and confirmed that defense counsel fully advised him of the right to take an appeal" under New York law "establishes that [the] defendant knowingly, intelligently and voluntarily waived his right to appeal" (*Ramos*, 7 NY3d at 738).

We observe that the oral colloquy in *Ramos* was perfunctory just as the oral colloquy was here. We also recognize that a review of the record in both cases reveals that the written waivers used were identical. Nonetheless, the critical distinction between these two cases is that the defendant in *Ramos*, unlike here, orally acknowledged on the record that he understood that he was forgoing his right to appeal. Thus, we concluded in *Ramos* that defendant's oral confirmation that he comprehended the nature of the appeal waiver in conjunction with the supplemental written waiver form satisfied the requirement that defendant's understanding of the appeal waiver was "evident on the face of the record" (*Lopez*, 6 NY3d at 256). Here, by contrast, defendant never orally confirmed that he grasped the concept of the appeal waiver and the nature of the right he was forgoing. Therefore, as in *DeSimone*, notwithstanding the written appeal waiver form, it cannot be said that defendant knowingly, intelligently and voluntarily waived his right to appeal (*see* 80 NY2d at 283).

We disagree with the dissent's suggestion that we have "transformed the taking of an appeal waiver" into a "game of chance," akin to the purchase of a lottery ticket (dissenting op at 268). Indeed, we advance no new rule today. Rather, we are simply applying our sound decisions—as we must—in *Seaberg*, *Callahan*, *DeSimone*, *Lopez* and *Ramos* to the particular circumstances of this case. And this precedent makes clear that "[t]o facilitate appellate review," it is the trial court's obligation "to ensure" that a defendant's understanding of the appeal waiver is "made apparent on the face of the record" (*Callahan*, 80 NY2d at 280; *see also Lopez*, 6 NY3d at 256). In *Ramos*, the trial court met this obligation by eliciting an oral response on the record from defendant that he comprehended the appeal waiver. That oral assurance, combined with the signed written waiver, permitted a finding that the defendant entered into a knowing, voluntary and intelligent appeal waiver. Since there is no evidence from the oral colloquy that Supreme Court adequately assured itself that defendant understood the nature of the appeal waiver, our precedents require a finding that the appeal waiver was invalid.

 Finally, we agree with the Appellate Division that testimony concerning complainant's identification of defendant in a lineup should have been suppressed since the People did not meet their burden in establishing probable cause for defendant's arrest.

Accordingly, the order of the Appellate Division should be affirmed.

READ, J. (dissenting). Today's decision brings to mind the New York State Lottery's slogan: "Hey, you never know." My colleagues in the majority, unlike Lottery officials, are not trying to encourage participation in a game of chance, but our trial judges might well be forgiven for concluding that the Court has now transformed the taking of an appeal waiver into something equally uncertain of outcome. This is perhaps best illustrated by comparing the facts and proceedings underlying our decision in *People v Ramos* (7 NY3d 737 [2006]), handed down only five years ago, with what happened here. Although the differences between the two cases are negligible to nonexistent, a unanimous court upheld Ramos's appeal waiver, whereas a divided court has now invalidated defendant Jay Jomar Bradshaw's.

To begin with, the majority emphasizes the 23-year-old Bradshaw's psychiatric history and status as a first-time felony offender at the time of his plea, although he had been convicted of a misdemeanor and on another occasion adjudicated a youthful offender (majority op at 259-260, 265-266). So, too, in *Ramos*, where the 30-year-old defendant had scant (if any)[1] experience with the criminal justice system before July 2001, when he was taken into custody in connection with attacks on six women between October 1999 and June 2001. At the time, Ramos suffered from long-standing psychiatric problems, including a history of manic depression and seizures. During the year and a half after his arrest, he was confined in various psychiatric facilities; he twice attempted suicide while awaiting disposition of his case. By October 2001, Ramos had undergone three competency examinations pursuant to article 730 of the Criminal Procedure Law, resulting in a 2-1 split of opinion. His case was repeatedly adjourned for the purpose of determining his competency.

In late 2002, two reviewing physicians found Ramos fit to

---

1. His attorney, in her brief, said that Ramos had never before been in trouble with the law. The District Attorney did not dispute this; however, in the transcript of the plea proceeding the District Attorney stated that Ramos had a prior felony arrest, but that the grand jury did not return an indictment.

stand trial. Still, one of these doctors was forced to terminate the examination when Ramos started scratching his face in a self-destructive manner. The physicians diagnosed Ramos as suffering from a probable grand mal seizure disorder; an adjustment disorder with mixed depression and anxiety; and borderline intellectual functioning. In January 2003, defense counsel and the prosecutor agreed, and the court confirmed, that Ramos was nonetheless fit to proceed within the meaning of article 730.

The plea hearing was held in May 2003—mere days after Ramos's second suicide attempt. The judge asked Ramos if he knew what medication he was taking. Ramos replied, "I have no idea. Right now I'm on Dilantin." When the judge queried if the medication made it difficult for him to "understand your surroundings," Ramos replied "I don't know, sir." In response to the judge's follow-up questions, Ramos stated that he knew he was in the courthouse, his lawyer was standing beside him and a judge was questioning him. The judge then asked, "Do you understand what we're doing here today?" and Ramos replied, "Not fully, but just . . . ." The judge interjected "What is it that you don't understand?" Before Ramos could respond, though, the judge elicited from him that his mother was in the courtroom; that he had discussed with his mother that he was going to have "either hearings and/or trial or to enter a plea on a negotiated plea for an agreed upon sentence"; that he had enjoyed "a full, fair and complete opportunity" to discuss his case with his attorney and his mother; and that he was satisfied with his attorney.

The judge next asked Ramos if he understood that he could go to trial, and that by deciding not to do so, he was giving up certain constitutional rights, including the right to have his case tried by a jury; to confront the witnesses against him; to remain silent; and to make the District Attorney persuade a jury of his guilt beyond a reasonable doubt. Ramos answered simply "Yes," each time. The judge explained the counts to which Ramos was pleading guilty and the promised sentence, and told him that his attorney was withdrawing any and all motions in the case. Again, Ramos responded "Yes" when asked if he understood what the judge was saying. He answered "No," only when questioned about whether any promises other than the bargained-for sentence had been made to induce him to plead guilty.

The entire colloquy about Ramos's waiver of his right to appeal consisted of the following exchange:

"THE COURT: You also understand that by entering this plea of guilty you're giving up any and all rights to appeal this conviction and sentence; in other words, this is now final. Once you agree to do this, not only will there not be any trial but there won't be any appeals; do you understand that this is final?

"THE DEFENDANT: Yes."

Ramos then withdrew his plea of not guilty, and admitted facts sufficient to establish that he was guilty of attempted assault in the first degree, first-degree attempted rape (two counts), first-degree rape (two counts) and first-degree robbery. The judge accepted Ramos's plea, which was made in exchange for the promise of a prison sentence not to exceed 35 years.

Although not mentioned at all during the plea proceeding, Ramos at some point signed a written waiver of his right to appeal. We know this happened because the written waiver was included in Supreme Court's file for the case. In signing the written waiver, Ramos stated as follows:

"I hereby waive my right to appeal. I execute this waiver after being advised by the court and my attorney of the nature of the rights I am giving up. I have been advised of my right to take an appeal (CPL 450.10), to prosecute the appeal as a poor person and to have an attorney assigned in the event that I am indigent, and to submit a brief and/or argue before an appellate court on any issues relating to my conviction and sentence.

"I make this waiver voluntarily, knowingly and of my own free will."

Ramos's attorney signed another section of the written waiver, representing that

"prior to the signing of the foregoing waiver, the above-named defendant was fully advised of the rights of a convicted person to take an appeal under the laws of the State of [N]ew York.

"I further represent that, in my professional opinion, the above waiver by the defendant of the right to appeal was voluntarily and knowingly made and recommend to the Court that the waiver be approved."

The judge did not sign the final part of the written waiver,

which states that the court was of the "opinion that the defendant has knowingly and freely waived the right to appeal," and that the waiver was approved.

When Ramos appeared for sentencing on June 5, 2003, he handed the court a pro se motion to withdraw his guilty plea based on a claim of mental incompetency. The judge noted that "[i]n reviewing the psychiatric reports, it is clear that there are some issues regarding [Ramos's] full function and he certainly suffers . . . from grand mal epilepsy," but denied the motion. The court cited the medical finding that Ramos was competent to stand trial; the extensive plea negotiations; Ramos's indication at the time of the plea that he understood the nature of the proceedings; and his "full allocution, which was both consistent and coherent." The judge sentenced Ramos to determinate prison terms aggregating 35 years, as bargained for.

The Appellate Division subsequently ruled that Ramos's waiver of the right to appeal was valid (*People v Ramos*, 21 AD3d 1125 [2d Dept 2005]). On appeal to us, Ramos argued that his waiver was not knowing, intelligent and voluntary because the judge presented the right to appeal as on a par with trial rights automatically forfeited by entry of a guilty plea, and was insufficiently "mindful of [Ramos's] intellectual and psychiatric deficits" when dealing with him.

With respect to the first point, Ramos relied on our decision in *People v Billingslea* (6 NY3d 248, 256 [2006]), where we stated that

> "[w]hen a trial court characterizes an appeal as one of the many rights automatically extinguished upon entry of a guilty plea, a reviewing court cannot be certain that the defendant comprehended the nature of the waiver of appellate rights. The record must establish that the defendant understood that the right to appeal is separate and distinct from those rights automatically forfeited upon a plea of guilty— the right to remain silent, the right to confront one's accusers and the right to a jury trial, for example."

With respect to the second point, Ramos cited *People v Seaberg* (74 NY2d 1, 11 [1989]) for the proposition that the trial judge must determine whether an appeal waiver was knowing and intelligent by considering, among other factors, the accused's "age, experience and background."

We held that Ramos's waiver of the right to appeal was valid because

"[e]ven if there were any ambiguity in the sentenc-
ing court's colloquy, [Ramos] executed a detailed
written waiver, distinguishing this case from *People
v Billingslea*, in which the sentencing court's col-
loquy was accompanied by nothing other than de-
fendant's one-word response to the question
whether she understood the conditions of her plea"
(7 NY3d 737, 738 [2006] [internal quotation marks
and citation omitted]).

Critically, we noted that Ramos's "written waiver stated that
[he] had the right to appeal, explained the appellate process and
confirmed that defense counsel fully advised him of the right to
take an appeal under the laws of the State of New York"; and
that "[t]he record therefore establishes that [Ramos] knowingly,
intelligently and voluntarily waived his right to appeal" (*id.*).

Here, unlike the situation in *Ramos*, the judge twice informed
Bradshaw that he was giving up his appeal rights, and did so in
a way that did not risk conflating the right to appeal with those
rights automatically forfeited by a guilty plea. The first
exchange follows:

"THE COURT: Let me just put the whole plea on the
record. You will be pleading guilty to rape in the
first degree, with a promised sentence of nine years,
to run concurrent with whatever you get in Queens
and the Bronx.[2] There's a period of something
called post release supervision that follows it. And
there are a couple of fines, which I do not have the
authority to waive, of $270, but that will come out
of inmate funds.

"There's a waiver of right to appeal. What that
means, the conviction here is final, that there is not
a higher court you can take it to. Do you understand
that?

"THE DEFENDANT: The waiver—I mean the money
fee, is this the same fee that—

"THE COURT: There will be one in each county.

"[DEFENSE COUNSEL]: They will take it out of inmate
funds.

---

2. As the majority opinion notes, Bradshaw had additional felony cases
pending against him in those boroughs (majority op at 260, 260 n 2).

"THE COURT: Do you understand that?

"THE DEFENDANT: Yes."

This exchange indicates that Bradshaw certainly heard what the judge had to say about both the waiver of his right to appeal and fees, but was only interested in following up about the fees. The judge's second "Do you understand that?" and Bradshaw's affirmative response might arguably refer to the judge's statement about the appeal waiver or the fees (or both), or only to the judge's and defense counsel's answer to Bradshaw's immediately preceding question about the fees.

The second exchange ensued later in the plea proceeding:

"THE COURT: Now, other than what I have already promised you, which is the nine years, with my recommendation of concurrent sentencing,[3] five years post release supervision, waiver of right to appeal, and $270 in fees and fines, has anybody else made any other promise to you in order to get you to plead guilty?

"THE DEFENDANT: No."

Again, Bradshaw, who frequently asked questions of the judge during the plea colloquy, said not a word about the waiver of appeal. He pleaded guilty to first-degree rape.

Finally, at the very end of the plea proceeding, the judge asked if the written waiver of appeal had been signed. Defense counsel responded, "Handing up to the Court . . . the waiver of right to appeal executed by Mr. Bradshaw and witnessed by myself as his attorney." The judge also signed the written waiver, which was identical to the one in *Ramos*.

At sentencing, Bradshaw made a pro se motion to withdraw his plea. He argued that his attorney "took advance [sic] of [his] mental disadvantage to fully understand" by "persuad-[ing]" and "coerc[ing]" him into taking a plea, and "misinform-[ing]" him about the "actual plea agreement" by inaccurately representing that he would receive a therapeutic program. The judge denied the motion and imposed the agreed-upon sentence of nine years in prison and five years of postrelease supervision.

So why was the appeal waiver valid in *Ramos* but not in this case? Ramos was at least as fragile mentally as Bradshaw, who participated far more actively in the plea proceeding. And in

---

**3.** If convicted after trial, Bradshaw might have been sentenced to 25 years in prison.

*Billingslea,* we explained that although the "better practice" would be for the judge to explain to a defendant during the plea colloquy that "though he ordinarily retains the right to an appeal even after pleading guilty, . . . he was being offered a particular plea by the prosecution on the condition that he give up that right," it was *"even better* to secure a written waiver" to the same effect (6 NY3d at 257 [emphasis added]). Further, in *Ramos,* we held that such a written waiver—and, as already mentioned, the written waivers in *Ramos* and in this case are identical—cured "any ambiguity in the sentencing court's colloquy" about whether the "[d]efendant's waiver of his right to appeal was effective" (7 NY3d at 738). Yet here, the majority completely discounts the written waiver, "render[ing it] entirely superfluous" in the words of the dissenters at the Appellate Division (76 AD3d 566, 579 [2d Dept 2010, Fisher, J., dissenting]). Put even more bluntly, we are evidently to assume that Bradshaw did not know what he was signing, and that defense counsel's and the court's representations are not to be believed. I respectfully dissent.

Chief Judge LIPPMAN and Judges PIGOTT and JONES concur with Judge CIPARICK; Judge READ dissents in a separate opinion in which Judges GRAFFEO and SMITH concur.

Order affirmed.