# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision
before publication in the New York Reports.

No. 87
The People &c.,
      Respondent,
     v.
Victor Thomas,
      Appellant.
------------------------

No. 88
The People &c.,
      Respondent,
     v.
Nicole L. Green, &c.,
      Appellant.
------------------------

No. 89
The People &c.,
      Respondent,
     v.
Storm U. Lang, &c.,
      Appellant.

For Case No. 87:

Louis F. O'Neill for appellant.
Justin J. Braun, for respondent.
Criminal Appeals Bureau of the Legal Aid Society, amicus curiae.


For Case No. 88:

James M. Specyal, for appellant.
Shirley A. Gorman, for respondent.
New York County Lawyers Association Committee on Appellate Courts, amicus curiae.


For Case No. 89:

Susan C. Ministero, for appellant.
Shirley A. Gorman, for respondent.

DiFIORE, Chief Judge:

In these three consolidated appeals, the defendants' written waivers of the right to appeal contained mischaracterizations of the scope of the appellate rights waived as a condition of the plea bargains. In two of the three cases, the trial courts' colloquies, in

- 1 -

eliciting defendants' oral waivers, similarly mischaracterized the appellate rights surrendered. Our primary task is to determine whether, under the circumstances of each case, the mischaracterizations impacted the knowing and voluntary nature of the three appeal waivers before us. Adhering to our well-established precedent in reviewing the validity of appeal waivers, we affirm in People v Thomas, as the appeal waiver was knowingly and voluntarily entered. We reverse in People v Green and People v Lang, as the appeal waivers were involuntarily made and thus are not enforceable.

People v Thomas

By indictment, defendant Victor Thomas was charged with class B violent felonies of first-degree assault and first-degree gang assault, and related crimes. He was identified by a police officer who recognized him, based on previous arrests, as the man in surveillance video pointing a gun at people attempting to assist the victim during a gang assault. While in custody at the precinct and prior to Miranda warnings, a detective showed Thomas a still photo taken from the video to answer Thomas' repeated questions as to why he was being detained. Immediately upon viewing the photo, Thomas stated: "You got me." Supreme Court denied his motion to suppress this oral statement on the ground that it was spontaneously made and not the result of interrogation or its functional equivalent.

The following day, Thomas pled guilty as a second-felony offender to a reduced class C violent felony charge of first-degree attempted assault in exchange for the promise of the legal minimum sentence of five years in prison to be followed by five years of postrelease supervision (PRS). This was the same plea offer made before the suppression

hearing was held. Thomas waived his right to appeal both orally and in writing as a condition of the plea bargain. During the oral plea colloquy, the trial court elicited from defendant his understanding that, "separate and apart" from the constitutional trial rights he waived, he was being asked to give up the right to appeal, meaning "to challenge to a higher court what is taking place right now, the plea and what will take place in about two weeks when you are sentenced." The written waiver form he and his attorney signed stated that, in consideration of the plea agreement, defendant "waives any and all rights to appeal including the right to file a notice of appeal from the judgment of conviction," with the exception of any constitutional speedy trial claim, the legality of sentence, competency to stand trial and "the voluntariness of this plea and [appeal] waiver." The court elicited defendant's acknowledgement that he "had a full opportunity" to consult with counsel "about what signing this waiver means" and the rights he was "giving up."

At sentencing, the court imposed upon defendant the promised legal minimum term and advised defense counsel to provide Thomas "with a notice of right to appeal for any rights that may survive that waiver." Defendant timely filed a notice of appeal and, on direct appeal, sought review of the validity of the appeal waiver and the order denying his motion to suppress his oral statement. The Appellate Division affirmed, holding that defendant's valid waiver of the right to appeal precluded review of the suppression ruling; in the alternative, the Court agreed with the suppression court that defendant's statement was spontaneous and not the product of interrogation (158 AD3d 434 [1st Dept 2018]). A Judge of this Court granted defendant leave to appeal (31 NY3d 1088 [2018]).

People v Green

After waiving indictment, defendant Nicole Green was charged by superior court information (SCI) with three counts of burglary in the second degree, class C violent felonies. Defendant pled guilty to one reduced count of attempted second degree burglary, a class D violent felony, in exchange for an initial sentence promise of a six-year prison term and three years of PRS. The court left open the possibility that the sentence could run consecutive to a nine-year prison sentence Green was then serving. A waiver of the right to appeal was a condition of the plea bargain offer. In describing the waiver, the court advised Green that:

> "ordinarily, . . . after somebody is convicted and sentenced in this court, they have the right to file an appeal to the Appellate Division Fourth Department. Some people get to take an appeal to the highest Court in the state after that, the Court of Appeals. Some people exhaust their state appeals and file appeals in the federal system. Some people come back here and ask to have their conviction vacated or modified. The [P]eople have indicated that in order to give you this cap on sentence, they are requiring you to waive your right to appeal; and once you are convicted and sentenced here, there will be no review by any other court. Do you understand that?"

Green answered that she did. The court next asked:

> "Do you understand that waiver goes to almost all issues of conviction and sentence, including the terms and length of your sentence, whether your sentence is excessive, you won't be able to hire an attorney to file an appeal for you, you won't get an assigned attorney to file an appeal for you, you won't be able to file your own appeal, you won't get waived filing fees. There is just going to be no review by any other court."

Green again confirmed that she understood and the court directed her to sign a written appeal waiver form stating that she was waiving "all rights to appeal," including her rights to take an appeal, to file a brief, to have counsel appointed if she could not afford one, to argue the appeal before an appellate court and to seek postjudgment CPL article 440 relief to vacate the conviction or sentence. Beneath that language, the form listed four issues that were excepted from the appeal waiver, including the voluntariness of the waiver. The court did not allocute Green as to whether she understood the form's contents.

Green then admitted her guilt of the charged burglary. After a brief recess and alerted by the prosecutor that a mandatory five-year PRS period was required as Green was a second violent felony offender, the court corrected the sentencing promise with respect to PRS. Green reaffirmed her acceptance of the plea bargain deal with the revised five-year PRS term, confirming that she did not want to withdraw her guilty plea. Counsel made it clear that Green's only concern was that the plea offer still included the possibility of concurrent time. Green then admitted her predicate violent felony conviction and was adjudicated a predicate felon. At sentencing, the court again asked if Green understood that the promised offer included the increased PRS term. After consulting with counsel, Green maintained her guilty plea and the court imposed the promised sentence but ordered it to run consecutively to the previously imposed sentence. The court advised defendant: "you waived your right to appeal at the time you entered the plea. If you intend to challenge that waiver, you would have to do so within 30 days or you lose your right to appeal forever." Defendant agreed that she understood. Green, proceeding pro se, sought and

received permission to file a late notice of appeal. On direct appeal, appellate counsel challenged the validity of the appeal waiver and raised an excessive sentence claim based on the consecutive sentences imposed. The Appellate Division affirmed, declining to review the sentence claim as precluded by a valid appeal waiver (160 AD3d 1422 [4th Dept 2018]). A Judge of this Court granted defendant leave to appeal (32 NY3d 1004 [2018]).

People v Lang

Seventeen-year-old defendant Storm Lang was charged by felony and misdemeanor complaints with four felony counts of sexual abuse, and two misdemeanor counts of sexual abuse stemming from his sexual assault of three children ages five, seven and twelve years old. Held for the action of the grand jury on six counts as charged in the complaints by two separate local courts, Lang agreed to waive prosecution by indictment after the County Court thoroughly explained his right to have the crimes presented to a grand jury and the consequences of waiving prosecution by indictment. After Lang confirmed that he had reviewed the indictment waiver form, the court directed him to sign the waiver, which he did in open court and in the presence of counsel. Accompanying the indictment waiver form was the SCI, which repeated the factual allegations of the six counts of sexual abuse charged in the felony and misdemeanor complaints, including the place and designated dates of each crime. In contrast, the waiver of indictment form identified the six counts of sexual abuse for which prosecution by indictment was waived, without mentioning any date, approximate time or place of the offenses as prescribed by CPL 195.10.

The plea bargain offer required Lang to waive his right to appeal and plead guilty to two felony counts and one misdemeanor count of sexual abuse in exchange for a promised sentence cap of four years in prison plus ten years of PRS. The same judge who took Green's plea presided over Lang's plea proceedings and used essentially the same appeal waiver description in its oral colloquy in both cases. Lang signed the identical written appeal waiver form that Green did, and the court, as with Green, did not ask Lang if he understood the contents. Lang acknowledged that his counsel advised him fully about the consequences of his plea, he had enough time to discuss the waiver with counsel and he had confidence in counsel's ability to represent him on the charges. The court accepted the plea after defendant admitted his guilt of the three relevant counts in the SCI.

During the sentencing proceeding, the court announced that it had "carefully reviewed all the documents that [had] been submitted, and . . . agree[d] with the probation department that youthful offender adjudication would be inappropriate in this case because of the importance of having sex offender registration of the defendant based upon his conduct." The court sentenced Lang to a prison term of three years, one year less than the promised cap, and ten years of PRS. Reminding Lang that he waived his right to appeal, the court advised him that if he intended to challenge the appeal waiver, he "would have to do so within 30 days." Lang indicated that he understood. Defendant timely filed a notice of appeal. On direct appeal, Lang challenged the validity of the appeal waiver and the court's denial of youthful offender status. The Appellate Division affirmed (165 AD3d 1584 [4th Dept 2018]). While agreeing with defendant "that the colloquy and written

waiver contain[ed] improperly overbroad language concerning the rights waived," the Court concluded that nonwaivable appellate issues were excluded from the scope of the waiver and the remainder was valid and enforceable, foreclosing review of the youthful offender determination (165 AD3d at 1584). A Judge of this Court granted defendant leave to appeal (32 NY3d 1174 [2019]).

I.

Observing that "[p]lea bargaining is now established as a vital part of our criminal justice system," we held in People v Seaberg that defendants may validly waive their right to appeal, provided the "settlement is fair, free from oppressiveness, and sensitive to the interests of both the accused and the People" (74 NY2d 1, 7-8 [1989]). That conclusion was based on our recognition that "[t]he pleading process necessarily includes the surrender of many guaranteed rights but when there is no constitutional or statutory mandate and no public policy prohibiting [waiver], an accused may waive any right which he or she enjoys" (74 NY2d at 7; see People v Moissett, 76 NY2d 909, 910-911 [1990]; cf. Cowles v Brownell, 73 NY2d 382 [1989]). Appeal waivers have long been lauded as serving the same beneficial public interests achieved by the plea-bargaining process itself – providing a prompt conclusion to litigation, avoiding delay and removing "the inevitable risks and uncertainties" of criminal trials for both sides (People v Selikoff, 35 NY2d 227, 232, 233 [1974] [quotation marks and citation omitted]; Seaberg, 74 NY2d at 7). Aside from "conserving judicial resources and providing finality in criminal proceedings" (People v Tiger, 32 NY3d 91, 101 [2018]), the plea bargaining process affords the accused

the opportunity to obtain a conviction on reduced charges and more lenient punishment in a truncated process that "hopefully start[s] the offender on the road to possible rehabilitation" (Selikoff, 35 NY2d at 233, 234, citing Santobello v New York, 404 US 257, 261 [1971]). Thus, we have rejected challenges to appeal waivers on the ground that they are "invalid per se" because plenary appellate review is necessary to protect defendants from "misconduct and coercion in the pleading process and ensure[] fairness in sentencing" – implicating societal interests that "transcend the individual concerns of the defendant" (Seaberg, 74 NY2d at 8-9). In rejecting such categorical condemnation of appeal waivers based on a purported power imbalance, we reasoned that those "arguments overlook the role of the trial court and its obligation to insure the reasonableness of the bargain struck and of the sentence imposed and the availability of collateral proceedings to review infirmities in the plea bargain which may not appear on the record" (74 NY2d at 8 [internal citations omitted]). Contrary to the argument that "defendants [are] victims of 'situational coercion,' compelled to execute waivers as a [plea] condition," we concluded that "[n]othing requires a defendant to seek a plea bargain and there is nothing coercive in leaving with the defendant the option to accept or reject a bargain if one is offered" (74 NY2d at 8-9).[1]

---

[1] In what is a rejection of Seaberg and its progeny – 30 years of appellate precedent – our colleague reaches the sweeping and unsubstantiated conclusion that "appeal waivers have . . . corrupted the integrity" of the plea-bargaining process (Wilson, J., concurring/dissenting op. at 2). This condemnation of appeal waivers is predicated on hypothetical constructs, rather than on the facts of the cases before us. It further evidences a mistrust of all players in the system, particularly the trial court and its ability to ensure that an appeal waiver is voluntarily entered. Moreover, it discounts the importance of

Manifestly, while a defendant always retains the right to challenge the voluntariness

of the plea (see People v Lopez, 71 NY2d 662 [1988]) and legality of the sentence, "the

negotiating process serves little purpose if the terms of a 'carefully orchestrated bargain'"

– particularly the sentence imposed – can subsequently be renegotiated despite a voluntary

appeal waiver (74 NY2d at 10, quoting People v Prescott, 66 NY2d 216, 220 [1985]).  We

see no public policy reason to depart from Seaberg and its progeny today, as carefully-

constructed and counseled appeal waivers – with the terms memorialized on the record and

executed under the supervision of the trial courts – continue to serve the same worthy

objectives, as they have for the last three decades.

Turning to the language of the appeal waiver colloquies at issue, the following

principles derived from our precedent are instructive.  First and foremost, a waiver of the

right to appeal is not an absolute bar to the taking of a first-tier direct appeal (see Seaberg,

---

defendant's consultation with competent counsel in opting for a plea bargain and comprehending the nature of the appeal waiver (see People v Nixon, 21 NY2d 338, 354 [1967]) – advice typically provided dehors the record in communications protected by attorney-client privilege.  Nonetheless, this partial concurrence concludes that while a plea bargain is eminently enforceable because the defendant is aware of "the precise terms of the offered sentence," or, in other words, is given the sentence in a numerical value, the separate appeal waiver is not enforceable because no "itemization" of the appellate rights waived is provided (Wilson, J., concurring/dissenting op. at 3).  Suffice it to say, with respect to defendant's waiver of constitutional Boykin rights (see Boykin v Alabama, 395 US 238, 243 [1969]), it is firmly established that courts need "not include a specific enumeration of each of the rights being waived" for a guilty plea to be enforceable (People v Harris, 61 NY2d 9, 18 [1983]).  No rationale whatsoever is provided for holding the enforceability of waivers of the statutory right to appeal to a standard more stringent than the one that applies to the complete waiver of constitutional trial rights.  And none exists, as defendant does not waive appellate review of fundamental issues, such as the voluntariness of the plea and appeal waiver.

74 NY2d at 11; People v Callahan, 80 NY2d 273, 280 [1992]; People v Hansen, 95 NY2d 227, 230-231 [2000]). "[S]everal categories of appellate claims" remain nonwaivable "because of a larger societal interest in their correct resolution" (Callahan, 80 NY2d at 280). One such claim is the voluntariness of the appeal waiver. Appellate courts have an integral role in reviewing the validity of appeal waivers, as they are vested with "the responsibility to oversee the process and to review the record to ensure that the defendant's waiver of the right to appeal reflects a knowing and voluntary choice" (80 NY2d at 280).

Although an appeal waiver entered as part of the plea-bargaining process does not serve as an absolute bar to the taking of a first-tier direct appeal, imprecision persists in trial courts' descriptions of the waiver of the right to appeal. Nonetheless, we have never required any particular litany explaining the finer distinction in appeal waiver colloquies between the "right to appeal" and the right to limited appellate review.[2] Indeed, while the phrase "waiver of the right to appeal" is a "useful shorthand" reference to what is more precisely a narrowing of the issues for appellate review, the term "can misleadingly suggest

---

[2] The defendant's conviction upon a guilty plea is predicated on the plea itself and will effectuate a forfeiture by operation of law of the appellate review of most antecedent issues raised in the trial court (see Hansen, 95 NY2d at 231-232). As stated herein, appellate review is not waivable, despite a guilty plea, for issues involving jurisdictional matters or "rights of a constitutional dimension that go to the very heart of the process" (95 NY2d at 231). Apart from the forfeited rights and the nonwaivable rights are the waivable rights that are the typical subject of appellate waivers – including the intermediate appellate court's review in the interest of justice of the severity of the sentence imposed and/or the CPL 710.70 right to appellate review of an adversely decided suppression motion. Of note, that some legal issues survive a guilty plea does not mean there is an inexorable appellate review, as any appellate review demands the existence of an actual issue extant on a sufficient factual record in the defendant's individual case to review (see People v Kinchen, 60 NY2d 772 [1983]).

a monolithic end to all appellate rights [when] [i]n fact . . . no appeal waiver serves as an absolute bar to all appellate claims" (Garza v Idaho, 586 US __, 139 S Ct 738, 744 [2019]).

Appeal waivers using such shorthand pronouncements are enforceable so long as the totality of the circumstances reveals that the defendant understood the nature of the appellate rights being waived. Historically, imprecise and overbroad language in appeal waivers did not prevent their enforcement, so long as "all the relevant facts and circumstances surrounding the waiver, including the nature and terms of the agreement and the age, experience and background of the accused" revealed that the waivers were knowingly, intelligently and voluntarily entered (Seaberg, 74 NY2d at 11; see also Callahan, 80 NY2d at 280). In People v Sanders, we clarified that "this Court has not . . . set forth the absolute minimum that must be conveyed to a pleading defendant in the plea colloquy in order for the right to appeal to be validly waived" (25 NY3d 337, 341 [2015]). Rather, in determining whether the record demonstrates that a defendant understood an appeal waiver's consequences, proper considerations include the defendant's consultation with counsel and on-the-record acknowledgments of understanding, a written appeal waiver that supplements or clarifies the court's oral advice and the defendant's experience with the criminal justice system (see 25 NY3d at 341-342; People v Bradshaw, 18 NY3d 257, 267 [2011]; People v Ramos, 7 NY3d 737, 738 [2006]; People v Lopez, 6 NY3d 248, 256 [2006]). The role played by counsel in ensuring a defendant's knowing and voluntary waiver is an important component of that analysis that cannot be ignored (see 22 NYCRR 606.5 [1st Dept]; 22 NYCRR 671.3 [2d Dept]; 22 NYCRR 821.2 [3d Dept]; 22 NYCRR

1015.7 [4th Dept]; Moissett, 76 NY2d at 911).  In the absence of any record support, we do not presume that counsel was somehow incompetent and failed to provide effective assistance during the plea negotiations as demanded by the Sixth Amendment (see Lafler v Cooper, 566 US 156 [2012]; McMann v Richardson, 397 US 759 [1970]).  And, of paramount importance is the trial court's responsibility to ensure that each defendant's "full appreciation of the consequences" and understanding of the terms and conditions of the plea and appeal waiver are "apparent on the face of the record" (Seaberg, 74 NY2d at 11; Callahan, 80 NY2d at 280).

In our earlier cases, when the litigation was focused on whether appeal waivers were enforceable as components of the plea-bargaining process – and not on the precise language of the courts' colloquies – we upheld appeal waivers where no court colloquy with the defendant occurred on the subject, relying on the record as a whole, particularly defense counsel's affirmative conduct in securing the desired sentence sought to be reviewed on appeal (see e.g. Seaberg, 74 NY2d 1), or where waivers were elicited through court colloquies suggesting an absolute bar to review, even though we acknowledged that the defendant retained the right to review certain fundamental issues despite the waiver (see e.g. Callahan, 80 NY2d at 278, 280 [court advised defendant that, "by pleading guilty he was waiving his right to appeal"]).  Relevant to the issues before us, our precedent has made clear from the outset that the scope of the appeal waiver contemplated by this process related only to a defendant's statutory "right to an initial appeal" (Seaberg, 74 NY2d at 7,

citing CPL 450.10),[3] and that a reasonable interpretation of broad waivers still permits the conclusion that the counseled defendant understood the distinction that some appellate review survived (Callahan, 80 NY2d at 280-281).

By 2006, in the companion cases of People v Lopez, People v Billingslea and People v Nicholson (6 NY3d 248, 256-257), the litigation required our focus to shift from the enforceability of broad appeal waivers to the precise language of the colloquies used by the courts in eliciting waivers, causing us to caution that the rights surrendered by appeal waivers were too important to be handled in a "perfunctory step." In Lopez, we set forth as a standard procedure for the court's appeal waiver colloquy – used in all three colloquies before us – an explanation by the court that the waiver of the right to appeal is "separate

---

[3] Our colleague's suggestion that courts should advise defendants that their "appeal waivers will impact their collateral remedies" (Garcia, J. concurring/dissenting op. at 14 [emphasis added]) is incorrect. Rather, it is a voluntary "guilty plea entered in proceedings where the record demonstrates the conviction was constitutionally obtained" that forecloses collateral attacks to the conviction, as a defendant "relinquishes any claim that would contradict the admissions necessarily made upon entry of a voluntary plea of guilty" (People v Tiger, 32 NY3d 91, 101, 102, quoting Class v United States, __ US __, 138 S Ct 798, 805 [2018] [internal quotation marks and citation omitted]). A waiver of the right to appeal is not needed to address the rights forfeited by law by the guilty plea itself, and that waiver cannot be used to foreclose appellate review of nonwaivable issues that exist on the record in any particular case (see Callahan, 80 NY2d at 280; People v Lopez, 71 NY2d 662 [1988]). As we noted herein, an appeal waiver only covers the narrow class of issues which, if not waived, can be reviewed on direct appeal despite the guilty plea. In stark contrast, CPL 440.10 relief, which codified the writ of error coram nobis, cannot be used as a substitute for a direct appeal (see People v Howard, 12 NY2d 65, 66-67 [1962]). Instead, it is designed as a remedy against injustice when no other avenue of judicial relief is available for certain nonwaivable rights impacted by fundamental errors dehors the record (see People v Cuadrado, 9 NY3d 362, 365 [2007]). As we are addressing guilty pleas, references in Judge Garcia's partial concurrence to subdivisions in 440.10 relating to trial errors is irrelevant to our discussion.

and distinct" from the so-called <u>Boykin</u> constitutional rights waived by the defendant in the guilty plea allocution (6 NY3d at 256).[4]  In <u>Nicholson,</u> we upheld the waiver following the court's additional shorthand advisement that the appeal waiver meant "to take to a higher court than this one any of the legal issues connected with this case," based on our review of the totality of the circumstances, which included the court's correct application of that "separate and distinct" language and defendant's multiple on-the-record acknowledgments of understanding (6 NY3d at 254, 256; <u>see</u> <u>also</u> <u>Sanders</u>, 25 NY3d at 341-342).  A few months later in <u>People v Ramos</u> (7 NY3d 737), we upheld an appeal waiver that followed the court's imprecise explanation that "by entering this plea of guilty you're giving up any and all rights to appeal this conviction and sentence; in other words, this is now final" (<u>Bradshaw</u>, 18 NY3d at 266 [quoting colloquy from <u>Ramos</u>]). We excused the "ambiguity" in that colloquy under the circumstances, which included a written waiver form evidencing that the defendant was advised of the appellate process and the waiver by defense counsel and defendant's on-the-record acknowledgement that he understood the rights he was waiving – all of which together sufficiently established a knowing and voluntary waiver (7 NY3d at 738).

---

[4] Judge Wilson concludes that the required separation between the court's allocution for the waiver of <u>Boykin</u> rights and the allocution for the appeal waiver means that the appeal waiver is not one of the conditions of the plea bargain offer and, therefore, if a defendant pleads guilty in exchange for a specific sentence, the defendant has received no consideration for the appeal waiver (<u>see</u> concurring/dissenting op. at 9-10).   This interpretation is not correct and eschews the mutually beneficial purpose of the plea bargain offer – to provide a favorable sentence in exchange for an end to litigation, including a review of the suppression order.

Importantly, we have drawn the line and held appeal waivers unenforceable where the court's advisement as to the rights relinquished was incorrect and irredeemable under the circumstances. Thus, we invalidated the defendant's appeal waiver in People v Billingslea, based upon the court's conflated advisement that "'when you plead guilty you waive your right of appeal,'" where the court's inquiry was limited to one question – whether defendant understood the consequences of the plea – and the defendant's one-word answer that she did (6 NY3d at 257). Our disapproval hinged on the court's "misleading" language, confusing the discrete concepts of the forfeiture of a right by operation of law and the defendant's intentional relinquishment of a right by a voluntary waiver (6 NY3d at 257). We concluded that "[w]hen a trial court characterizes an appeal as one of the many rights automatically extinguished upon entry of a guilty plea, a reviewing court cannot be certain that the defendant comprehended the nature of the waiver of appellate rights" (6 NY3d at 256). We also invalidated the appeal waiver in People v Bradshaw, where the court's colloquy was "terse" – advising the defendant that an appeal waiver "means[] the conviction here is final, that there is not a higher court you can take [the case] to" – since the record did not contain any assurances that the defendant, who had a significant mental health history, understood the shorthand reference to the distinct appellate rights he was surrendering and, beyond asking whether it had been signed, the court made no inquiry of the defendant's understanding of the contents of the written appeal waiver form (18 NY3d at 261, 273).

Our requisite analysis for determining the validity of the waiver remains focused on whether all the relevant circumstances reveal a knowing and voluntary waiver (see Seaberg, 74 NY2d at 11; Sanders, 25 NY3d at 341-342). As we underscored in Bradshaw, the court's oral colloquy with defendant, including the elicitation of an oral acknowledgment that defendant was "forgoing his right to appeal," can cure incorrect language in the written waiver form (18 NY3d at 267).[5] Of course, "[w]e expect judges to express the consequences of a guilty plea clearly to the defendant during the plea hearing. But in cases too numerous to list dating from at least 1967, we have repeatedly steered clear of a uniform mandatory catechism . . . in favor of broad discretions controlled by flexible standards . . . " (People v Alexander, 19 NY3d 203, 219 [2012] [internal quotation marks and citation omitted]). We have emphasized that "it should not matter that the trial judge failed to choose what we might in hindsight consider to be more felicitous words or turns of phrase when addressing [a] defendant" so long as the meaning was "plain enough" (19 NY3d at 219).

## II.

Viewed against that backdrop, we conclude that the appeal waiver in Thomas was knowingly and voluntarily entered. We reach the opposite conclusion in Green and Lang.

---

[5] That said, our appellate waiver precedent also establishes that, "[e]ven if there [is] any ambiguity in the sentencing court's colloquy, . . . a detailed written waiver, . . . stat[ing] that defendant had the right to appeal, explain[ing] the appellate process and confirm[ing] that defense counsel fully advised [defendant] of the right to take an appeal under the laws of the State of New York" can "establish[] that [a] defendant knowingly, intelligently and voluntarily waived [the] right to appeal" (Ramos, 7 NY3d at 738).

Defendant <u>Thomas</u> argues that insertion of "no-notice-of-appeal" language in the written waiver form "voids the entire appeal waiver process." While that particular language – suggesting that the waiver may be an absolute bar to the taking of an appeal – was incorrect, it was coupled with clarifying language in the same form that appellate review remained available for certain issues, most importantly, the validity of the appeal waiver itself, and indicating, therefore, that the right to take an appeal was retained. The court's oral colloquy, specifically its inquiry of Thomas and resulting assurances that he had ample opportunity to discuss with counsel the meaning of the waiver and appellate rights he was surrendering, was sufficient to support a knowing and voluntary waiver under the totality of the circumstances.

Somewhat inconsistently, Thomas alternatively claims that the court's statement during the oral colloquy that he was waiving his right to challenge the "plea proceedings" and "sentence" was a "restricted" appeal waiver rather than a broad, "comprehensive" appeal waiver and therefore did not cover the CPL 710.70 right to review a suppression ruling. We disagree. In <u>People v Kemp</u> (94 NY2d 831, 833 [1999]), we held that the defendant's waiver of the right to appeal, entered one day after denial of his suppression motion, was "knowingly, voluntarily and intelligently made, with the advice of counsel," and was "comprehensive[]," as it "was manifestly intended to cover all aspects of the case." Similarly, Thomas, fully counseled, voluntarily pled guilty one day after denial of his suppression motion, to take advantage of a soon-to-expire pretrial reduced plea bargain offer – the same one offered before the suppression hearing was held. The court's

statement that he would be waiving his right to challenge on appeal what was taking place at the plea proceedings – clearly referencing his conviction – was sufficient to indicate the waiver was intended "to cover all aspects of the case" (94 NY2d at 833).

In this regard, the waiver of appellate review of the suppression order was the quid pro quo to the reduced plea bargain, which was designed to end the litigation for all parties. Far from evidencing a coercive deal that did not involve "mutual concessions," as the partial concurrence posits (Wilson, J., concurring/dissenting op. at 9), the record instead supports the conclusion that this fully counselled predicate felon – whose crime was captured on video surveillance – received a highly beneficial bargain of the legal minimum term of five years' incarceration for the reduced crime, while avoiding the risk of the maximum of twenty-five years on the higher crimes charged, if convicted after trial. Defendant does not have the right to subsequently eviscerate the favorable plea bargain he knowingly and voluntarily accepted. Long before Seaberg, we held the voluntary waiver of the CPL 710.70 right to appellate review of a suppression ruling can be a condition of the plea bargain (see People v Williams, 36 NY2d 829, 830 [1975]). Since harmless error analysis is generally not available on an appeal following a guilty plea, the waiver of appellate review of the suppression decision serves to avoid unnecessary litigation for errors that would not have affected the outcome of a trial (see People v Grant, 45 NY2d 366, 378 [1978]). Given the evidence here, counsel's advice to defendant in this regard in favor of the plea offer would be eminently reasonable. On this record, Thomas' appeal waiver was knowingly and voluntarily entered and sufficiently comprehensive to cover an

appellate challenge to the suppression ruling – without any need for express mention of it during the waiver colloquy – squarely under our holding in Kemp.

### III.

A similar conclusion does not follow in Green and Lang. The trial court's mischaracterization of appellate rights waived as encompassing not only an absolute bar to the taking of a direct appeal and the loss of attendant rights to counsel and poor person relief, but also all postconviction relief separate from the direct appeal,[6] is even more serious than the conflated language in Billingslea. We reiterate that, when a trial court has utterly "mischaracterized the nature of the right a defendant was being asked to cede," an appellate "court cannot be certain that the defendant comprehended the nature of the waiver of appellate rights" (6 NY3d at 256-257). As in Billingslea, it is similarly impossible to tell, on these records, whether the waivers entered by defendants Green and Lang were knowing and voluntary. The waivers cannot be upheld in these cases on the theory that the offending language can be ignored and that defendants' waivers were enforceable based on the court's few correctly spoken terms. That position ignores the muddled nature of the court's advisements, making it impossible for reviewing courts to discern whether the defendants understood the import of the court's confused message about the important rights being waived, much less to expect the defendants themselves to grasp the nature of

---

[6] Contrary to the conclusion of our colleague that no such argument about postconviction relief was ever "argued" by the parties (Garcia, J., concurring/dissenting op. at 11), in his sealed brief to this Court, defendant Lang specifically challenged the plea court's advisements in both the oral colloquy and the written waiver regarding the restriction of his rights to seek collateral relief.

the rights they are surrendering.  Nor were there "detailed written waiver[s]" in these cases that correctly explained the appellate process and were adequate to cure the "ambiguit[ies] in the . . . court's colloquy" (Ramos, 7 NY3d at 738); rather, the written waivers at issue repeated many of the errors in County Court's colloquies and, in any event, the court failed to confirm that Green and Lang understood the contents of the written waivers.  The improper description of the scope of the appellate rights relinquished by the waiver is refuted by our precedent, whereby a defendant retains the right to appellate review of very selective fundamental issues, including the voluntariness of the plea and appeal waiver, legality of the sentence and the jurisdiction of the court (see generally Seaberg, 74 NY2d 1; Sanders, 25 NY3d 337).  Thus, we cannot conclude that the appeal waivers on the records in Green and Lang were knowingly or voluntarily made in the face of erroneous advisements warning of absolute bars to the pursuit of all potential remedies, including those affording collateral relief on certain nonwaivable issues in both state and federal courts (see CPL 440.10 [1] [a], [b], [e]; 440.20; Parisi v United States, 529 F3d 134, 139 [2d Cir 2008], cert denied 555 US 1197 [2009]).  Accordingly, reversal is warranted in Green and Lang and, in both cases, we remit for a determination of all issues raised but not determined below.

We further take this opportunity to note that the employment of imprecise appeal waiver colloquies has been criticized as encouraging a pathway to increased appellate litigation over the validity of the waivers.  That pathway was always extant, since appellate review as to the validity of the waiver has always been and remains a necessary component of the process (see Seaberg, 74 NY2d 1; Callahan, 80 NY2d 273).  Appellate review of the

voluntariness of an appeal waiver is not onerous. Greater precision in the courts' oral

colloquies will provide more clarity on the record as to the issue of voluntariness. To be sure,

the Model Colloquy for the waiver of right to appeal drafted by the Unified Court System's

Criminal Jury Instructions and Model Colloquy Committee neatly synthesizes our precedent

and the governing principles and provides a solid reference for a better practice. The Model

Colloquy provides a concise statement conveying the distinction missing in most shorthand

colloquies – that:

> "[b]y waiving your right to appeal, you do not give up your right
> to take an appeal by filing a notice of appeal . . . within 30 days
> of the sentence. But, if you take an appeal, you are by this
> waiver giving up the right to have the appellate court consider
> most claims of error,[] and whether the sentence I impose,
> whatever it may be, is excessive and should be modified. As a
> result, the conviction by this plea and sentence will normally be
> final"

(NY Model Colloquies, Waiver of Right to Appeal [emphasis added]). There is no mention

made of an absolute bar to the taking of an appeal or any purported waiver of collateral or

federal relief in the Model Colloquy or to the complete loss of the right to counsel to

prosecute the direct appeal.[7]

---

[7] The Model Colloquy also defines an appeal and the attending rights. "An appeal is a proceeding before a higher court, an appellate court. If a defendant cannot afford the costs of an appeal or of a lawyer, the state will bear those costs. On an appeal, a defendant may, normally through his/her lawyer, argue that an error took place in this court which requires a modification or reversal of the conviction. A reversal would require either new proceedings in this court or a dismissal" and provides that the court should instruct the defendant that, "as a condition of the plea agreement, [the defendant is being] asked to waive [the] right to appeal" (NY Model Colloquies, Waiver of Right to Appeal). This explanation of the appellate process is consistent with that endorsed by this Court in Ramos (7 NY3d at 738; see Bradshaw, 18 NY3d at 270 [Read, J., dissenting] [setting forth the language of the written upheld in Ramos]). Our discussion here of colloquies that

IV.

In addition to his challenge to the appeal waiver, defendant Lang also claims that his written waiver of indictment was jurisdictionally defective because, notwithstanding its substantial compliance with CPL 195.20 as to content, it did not state the date, approximate time and place of the specific offenses for which he was held for the action of the grand jury, in violation of that statute. Although he raises this issue for the first time before this Court, he claims the argument is reviewable because this statutory violation is either a mode of proceedings error or is jurisdictional in nature and not forfeited by the guilty plea. Neither argument has merit.

First, Lang has failed to identify any "mode of proceedings" error. The indictment waiver form was executed in full accord with the procedural requirements of article 1, § 6 of our State Constitution, as it was "evidenced by written instrument [and] signed by the defendant in open court in the presence of . . . counsel." The waiver also strictly complied with the procedures set forth in CPL 195.10, the statute that implements those constitutional requirements, which specifies that a defendant may waive indictment and consent to be prosecuted by SCI when a local court has held the defendant for the action of a grand jury, the defendant is not charged with a class A felony, and the district attorney consents to the waiver. Pursuant to CPL 195.10 (2) (b), the waiver of indictment was exercised prior to the filing of an indictment by the grand jury. Finally, the six counts of sexual abuse charged in the SCI were the same crimes for which defendant was held for

---

mischaracterize the nature of the appeal waiver should not be interpreted as calling into question this portion of the Model Colloquy or signaling a retreat from Ramos.

the action of the grand jury (see People v Milton, 21 NY3d 133, 135-136 [2013]), and the waiver form duly noticed those specific crimes in conformity with both constitutional and CPL 195.20 mandates. Accordingly, there is no merit to his claim that any fundamental mode of proceedings error occurred.

Notwithstanding the specificity of the factual allegations of the crimes charged in all the accusatory instruments in the case, Lang attempts to equate the omission of the date, approximate time and place in the waiver form with a "[f]ailure to adhere to the statutory procedure for waiving indictment," arguing it is a "jurisdictional" defect under People v Boston (75 NY2d 585, 589 n * [1990]). Reliance on Boston to elevate this technical challenge to a jurisdictional claim is misplaced. Boston involved a waiver of prosecution by indictment exercised after the indictment was obtained – a violation of the critical timing of the waiver process mandated by both the constitution and CPL 195.10 (see 75 NY2d at 588). No such jurisdictional infirmity existed here.

In contrast, "[a] purported error or insufficiency in the facts of an indictment or information to which a plea is taken does not constitute a nonwaivable jurisdictional defect and must be raised in the trial court" (Milton, 21 NY3d at 138 n *, citing People v Iannone, 45 NY2d 589, 600 [1978]; see also People v D'Angelo, 98 NY2d 733, 735 [2002] [absent timely motion to dismiss, the Court has "no occasion to consider whether statutory mandates beyond the jurisdictional minimum required the indictment to recite" additional allegations]). By parity of reasoning, the omission from the indictment waiver form of non-elemental factual information that is not necessary for a jurisdictionally-sound indictment is similarly forfeited by a guilty plea. As relevant here, the legislative history

accompanying enactment of CPL article 195 makes plain that the purpose of the written waiver of indictment form is to ensure the defendant had notice of the charges upon which the prosecution by SCI would proceed (see Bill Jacket, L 1974, ch 467, Mem of Staff Attorney of Law Rev Commn at 2; Governor's Program Bill Mem at 2; People v Myers, 32 NY3d 18, 23 [2018]).  Executed solemnly in open court, the waiver form must memorialize with sufficient specificity the charges for which a defendant waives prosecution by indictment.  Here, the statutory notice was accomplished as the six counts of sexual abuse designated in the waiver form were identical to the crimes for which Lang was held for grand jury action and originally charged in the local court accusatory instruments.

Despite the factual omissions of date, approximate time and place of the specific offenses in his written waiver of indictment, Lang lodges no claim that he lacked notice of the precise crimes for which he waived prosecution by indictment.  Nor could he, since the dates and places of the offenses were sufficiently detailed in each of the actual accusatory instruments – the three local court complaints and the SCI – charging this defendant.  As a matter of statutory mandate, upon defendant's arraignment in each local court, the court was required to furnish defendant with a copy of the accusatory instruments and thereafter provide defendant notice of the crimes for which he would be held for the action of the grand jury (CPL 170.10; CPL 180.10).  During the indictment waiver proceeding, the People provided defendant with an advance copy of the SCI, which was contemporaneously filed with the waiver of indictment form.  Determinatively, the indictment waiver form identified all six counts of sexual abuse as alleged in the local court

accusatory instruments – specifically, three counts of sexual abuse in the first degree and two counts of sexual abuse in the second degree for which he was held for the action of the grand jury by Town of Alabama Justice Court and one count of sexual abuse in the first degree for which he was held for the action of the grand jury by Town of Bethany Court. The written waiver form further acknowledged that "[t]he [SCI] to be filed . . . will charge the offense(s) named in this written waiver" – clearly incorporating by reference the six counts of sexual abuse specifically alleged in the accompanying SCI.

In assessing the facial sufficiency of facts alleged as to non-elements of the crime in an accusatory instrument, the fundamental concern is whether the defendant had reasonable notice of the charges for double jeopardy purposes and to prepare a defense. In child sexual assault cases, we have upheld indictments alleging an approximate time span of a period of months as sufficiently stated time intervals to comply with due process notice requirements (see e.g. People v Watt, 81 NY2d 772, 774 [1993]). Accepting defendant's argument that there must be strict compliance with the CPL 195.20 time requirement in written waiver of indictment form would eliminate prosecution by SCIs involving most child sexual assaults, where a time of offense often cannot be specified – an absurd result. Moreover, all defendants can seek a bill of particulars as the remedy to obtain the more specific information necessary for notice purposes (see People v Morris, 61 NY2d 290, 293 [1984]), although the information Lang demands belatedly on this appeal, again, was contained in the accusatory instruments he undeniably received. In sum, Lang received sufficient notice of the offenses for which he waived prosecution by indictment in the

indictment waiver form, and having pled guilty without raising any legal challenge to the contents of that form in the trial court, there is no further issue to review on this appeal.

Accordingly, in People v Thomas, the order of the Appellate Division should be affirmed, and in People v Green and People v Lang, the orders of the Appellate Division should be reversed and the matters remitted to that Court for further proceedings in accordance with this opinion.

People v Victor Thomas
People v Nicole Green
People v Storm U. Lang

Nos. 87, 88, 89

RIVERA, J. (concurring in result in <u>People v Thomas</u>, <u>People v Green</u>, and <u>People v Lang</u>):

I agree with Judge Wilson's thoroughly compelling discussion of appellate waivers and his conclusion that they "have proved unworkable, they have created more questions than they resolve, and when viewed from the 'cold light of logic and experience,' they do

- 1 -

not serve the ends of justice" (Wilson, J., concurring/dissenting op at 17). A defendant who pleads guilty should be able to pursue an intermediate appeal as of right (see CPL 450.10; accord People v Ventura, 17 NY3d 675, 679 [2011] ["Pursuant to CPL 450.10, which codifies a criminal defendant's common-law right to appeal to an intermediate appellate court, (a defendant has) an absolute right to seek appellate review of (the defendant's) conviction( )"]). Thus, for the reasons discussed in Judge Wilson's analysis, with which I fully concur, the appeal waivers in the three appeals before us are invalid.

Turning to the remaining matters, and proper disposition of these respective appeals, in People v Thomas, I concur in the result because although the waiver is ineffective, defendant's sole ground for reversal presents a mixed question of law and fact, and the decision to deny suppression has record support (see People v Wheeler, 2 NY3d 370, 373 [2004]; People v Mayorga, 64 NY2d 864, 865 [1985]). In People v Green, because the waiver is not valid, the order of the Appellate Division should be reversed and the matter remitted to that Court for further proceedings.

In People v Lang, I concur in the result, but not on the basis of the majority's sweeping rule that a waiver of prosecution by indictment is valid, so long as the missing information is set forth in the local court accusatory instruments, even if the waiver lacks the details required under CPL 195.20. That rule ignores the text and purpose of the CPL requirements.

Under our State Constitution, a defendant may waive, in writing and in open court, an indictment by grand jury and declare the defendant's consent to be prosecuted by an

information filed by the district attorney (NY Const, art I, § 6). The CPL codifies this requirement and establishes the procedure to effectuate the waiver. Section 195.10 (2) (b) of the CPL provides, in relevant part, that a defendant may waive indictment "at any time prior to the filing of an indictment by the grand jury." CPL 195.20 requires that a waiver of indictment shall contain "the name of the court in which it is executed, the title of the action, and the name, date and approximate time and place of each offense to be charged." We have explained that CPL 195.20 "reiterates the constitutional requirements and specifies additional items the written waiver must include" (People v Myers, 32 NY3d 18, 22 n 2 [2018]), and that a waiver of indictment is only effective if it is "within the express authorization of the governing constitutional and statutory exception" (id., quoting People v Trueluck, 88 NY2d 546, 549 [1996]). "Failure to adhere to the statutory procedure for waiving indictment which resulted in [defendant's] plea[] may be considered jurisdictional" (People v Boston, 75 NY2d 585, 589 n * [1990]).

The purpose of the CPL requirement that a defendant sign, in open court, a waiver of indictment by grand jury—detailing, among other things, each offense to be charged by superior court information (SCI)—is twofold: it (1) provides a defendant with notice of the right to presentment of the charged crimes for grand jury consideration, and (2) impresses upon them the solemnity of the right and the consequences of the waiver. Substantial compliance with "the additional items the written waiver must include" furthers these dual goals and satisfies the constitutional and statutory mandates.

Unlike the majority, I interpret the CPL to require that the substance of those additional items be contained in the waiver form or, if filed along with the form, the SCI. Those are the only two documents expressly identified in our state constitution and the CPL as necessary prerequisites to a lawful waiver of indictment, and so in determining the validity of the waiver, we may consider the contents of the SCI when jointly filed. In appropriate cases, this ensures the defendant understands that by pleading guilty they would give up the right to have the grand jury "assess[] the sufficiency of the prosecutor's case" (People v Pelchat, 62 NY2d 97, 104 [1984]), meaning they would forgo this safeguard against "potentially oppressive excesses by the agents of the government in the exercise of the prosecutorial authority vested in the State" (People v Iannone, 45 NY2d 589, 594 [1978]) because they would consent to prosecution for the crimes charged in the SCI filed by the district attorney (CPL 195.20 [b]).

Here, the SCI—the instrument by which defendant agreed to be prosecuted for the offenses described therein—was presented to defendant in advance of the oral waiver and attached to and filed simultaneously with the waiver form. It contained all details required by CPL 195.20 otherwise missing from the form, except for the approximate time of the alleged offenses. Significantly, CPL 195.20 requires only an approximation of the time of each offense and, as the majority correctly notes, the Court has upheld indictments in child sexual assault cases spanning months (majority op at 26). Thus, in defendant's case, the dates of the alleged child sexual abuse offenses set forth in the SCI cabined the time period, and the waiver form and SCI considered together amount to substantial compliance with

the statutory requirement.  Moreover, on the same day the waiver and the SCI were filed, the court thoroughly reviewed with defendant the right to grand jury presentment prior to his signing the waiver form in open court.  Under these circumstances, defendant has failed to establish a defect warranting rejection of his waiver of indictment.

People v Victor Thomas
People v Nicole Green
People v Storm U. Lang


Nos. 87, 88, 89


GARCIA, J. (concurring in result in <u>People v Thomas</u> and dissenting in <u>People v Green</u> and <u>People v Lang</u>):

A waiver of the right to appeal will be upheld where the record demonstrates that it was knowingly, intelligently, and voluntarily made (<u>People v Seaberg</u>, 74 NY2d 1, 11 [1989]).  That sensible standard has been settled for more than three decades, and

- 1 -

repeatedly reaffirmed by this Court. It has been employed to evaluate countless appeal

waivers, and consistently relied on by our State's lower courts—who bear the heaviest

burden as the final arbiters in the overwhelming majority of waiver cases. Time and time

again, we have assured trial courts that there is no mandatory litany that must be used to

secure a valid appeal waiver; so long as it is knowing, intelligent, and voluntary, the waiver

will be upheld (see People v Sanders, 25 NY3d 337 [2015]; People v Lopez, 6 NY3d 248

[2006]; People v Lococo, 92 NY2d 825 [1998]; People v Hidalgo, 91 NY2d 733 [1998];

People v Seaberg, 74 NY2d 1 [1989]).

The majority accurately articulates that standard—then promptly abandons it.

Instead, applying an alternative approach, the majority examines whether the trial court's

description of the waiver was "improper" or somehow "irredeemable under the

circumstances" (majority op at 16, 21). Preoccupied with punishing the trial court, the

majority discards voluntariness as the touchstone of the appeal waiver inquiry. In doing

so, the majority loses sight of the determinative factor in our analysis: In all three cases,

defendants knowingly, intelligently, and voluntarily waived the right to appeal in exchange

for generous plea deals. Defendants should be held to their bargains.

I.

In People v Seaberg, this Court held for the first time that "criminal defendants may

waive their rights to appeal as part of a negotiated sentence or plea bargain" (74 NY2d at

5). To be enforceable, we said, the waiver must be "voluntary" as well as "knowing and

intelligent" (id. at 11). In other words, the reviewing court's focus should remain on

whether the defendant "knew and understood the terms" of the waiver and whether, so equipped, "he willingly accepted them" (id. at 12).  Even an imperfect waiver, then, will remain valid so long as "there is ample evidence in the record" that the defendant "agreed to the bargain and did so voluntarily with a full appreciation of the consequences" (id. at 11).

In the thirty years since Seaberg, we have consistently emphasized that trial courts need not engage in any particular litany in order to obtain a valid waiver of appellate rights (see People v Johnson, 14 NY3d 483, 486 [2010]; People v Lopez, 6 NY3d 248, 256 [2006]; People v Callahan, 80 NY2d 273, 283 [1992]; People v Moissett, 76 NY2d 909, 910-911 [1990]; People v Nixon, 21 NY2d 338, 353-354 [1967]).  Despite calls for a compulsory colloquy, we have repeatedly rejected mandatory catechisms in favor of broader trial court discretion (People v Sanders, 25 NY3d 337, 341 [2015]).  "[S]ound discretion exercised in cases on an individual basis," we have reasoned, is preferable to a "uniform procedure" that would inevitably "become a purely ritualistic device" (id., quoting People v Nixon, 21 NY2d 338, 355 [1967]).  With the benefit of a face-to-face encounter, the trial court is "in the best position" to evaluate the voluntariness of each defendant's waiver (Callahan, 80 NY2d at 280).  Applying that approach, we have upheld appeal waivers of all shapes and sizes.

We have, for instance, "upheld appeal waivers where no court colloquy with the defendant occurred" (majority op at 13, citing People v Seaberg, 71 NY2d 1 [1989]).  Indeed, in People v Moissett, we held that the defendant validly waived his right to appeal,

overlooking the fact that "the record [did] not reveal an explicit waiver" (76 NY2d at 911).

Decades later, in People v Sanders, we upheld an appeal waiver comprised only of three

questions posed by the prosecutor, who conducted the entire colloquy without input from

the trial court (25 NY3d at 339-340). As these cases demonstrate, there is no "absolute

minimum that must be conveyed to a pleading defendant in the plea colloquy in order for

the right to appeal to be validly waived" (id. at 341). So long as the defendant intentionally

relinquished a known right (People v Hansen, 95 NY2d 227, 230 n 1 [2000]), "it should

not matter that the trial judge failed to choose what we might in hindsight consider to be

more felicitous words or turns of phrases" (People v Alexander, 19 NY3d 203, 219 [2012]).

Simply put, even on a sparse record, a voluntary waiver will be upheld.

We have also upheld appeal waivers on the opposite end of the spectrum—waivers

that use "overbroad language" or that suggest "an absolute bar to review" (see majority op

at 12, 13). For instance, in People v Hidalgo, the court informed the defendant that, once

her guilty plea was accepted, she could not "come back to this Court or to any court to set

aside [her] conviction" (People v Maracle, 19 NY3d 925, 930 [2012] [Graffeo, J.,

dissenting] [quoting the Hidalgo waiver colloquy]). Similarly, in People v Nicholson, the

trial court informed the defendant that his waiver encompassed the right "to take to a higher

court . . . any of the legal issues connected with this case" (brief and appendix for

defendant-appellant in People v Nicholson, 6 NY3d 248 [2006]). And in People v Thomas,

the defendant was "incorrect[ly]" required to waive his "right to appeal" as well as his right

to "file a notice of appeal" (majority op at 17-18; appendix for defendant-appellant in People v Thomas).

By implying that all appellate avenues were forever foreclosed, each of these appeal waivers contained "imprecise" information (see majority op at 12). Of course, even a perfunctory statement that a defendant has "waived the right to appeal" is not entirely accurate, as there are several well-established categories of appellate claims that can never be waived (see Callahan, 80 NY2d at 80 [discussing the "categories of appellate claims that may not be waived," including "the constitutionally protected right to a speedy trial, challenges to the legality of court-imposed sentences, and questions as to the defendant's competency to stand trial"] [citations omitted]). Despite their "overbroad" language, we upheld those appeal waivers based on our singular focus on whether each defendant's waiver was "knowingly, intelligently and voluntarily entered" (majority op at 12).

In the rare case where the Court invalidated an appeal waiver, we emphasized the manner in which the trial court's error infected the voluntariness of the defendant's decision. In People v DeSimone, for instance, "[t]here was no record discussion between the court and [the] defendant concerning the waiver," let alone "an acknowledgement from the defendant" that he understood and accepted its terms (80 NY2d 273, 283 [1992]). Similarly, in People v Bradshaw, we invalidated the appeal waiver because the defendant— who had a "history of mental illness"—"never orally confirmed that he grasped the concept of the appeal waiver and the nature of the right he was forgoing" (18 NY3d 257, 265, 267 [2011]). And in in People v Billingslea, the trial court inaccurately "characterize[d] an

appeal as one of the many rights automatically extinguished upon entry of a guilty plea," and therefore the record was "not sufficient to guarantee that [the] defendant understood the valued right she was relinquishing" (6 NY3d 248, 256-257 [2006]).  In all of these cases, the trial courts' errors prevented the defendants from fully appreciating the wide-ranging consequences of their waivers, thereby creating a risk that the defendants unknowingly abandoned appellate rights they intended to retain.

## II.

Applying that standard to the instant appeals, the record confirms that each defendant knowingly, intelligently, and voluntarily waived the right to appeal.  Each defendant was represented by counsel and confirmed on the record that he or she had an adequate opportunity to discuss the waiver with defense counsel (see Moissett, 76 NY2d at 911; majority op at 12-13 ["The role played by counsel in ensuring a defendant's knowing and voluntary waiver is an important component of that analysis that cannot be ignored"]).  Each defendant was informed that the waiver of the right to appeal was separate and apart from the rights ordinarily forfeited by a guilty plea (see Billingslea, 6 NY3d at 256-257).  Each defendant was advised that his or her waiver would not bar certain appellate arguments, including claims concerning the legality of the imposed sentence, competency to stand trial, constitutional speedy trial, and the voluntariness of the waiver (see Callahan, 80 NY2d at 280).  Each defendant orally confirmed on the record that he or she understood the import of the waiver (see Bradshaw, 18 NY3d at 265; DeSimone, 80 NY2d at 279).  And each defendant executed a detailed written waiver form in open court,

which expressly reaffirmed the knowing, intelligent, and voluntary nature of his or her waiver (Ramos, 7 NY3d at 738 [holding that a "detailed written wavier" could overcome "ambiguity" in the waiver colloquy]).

In addition, all three defendants had prior exposure to the criminal justice system (see Sanders, 25 NY3d at 342 [considering the "defendant's background, including his extensive experience with the criminal justice system"]).  For instance, defendant Thomas, a second felony offender, confirmed his previous conviction for criminal sale of a controlled substance.  And defendant Green, a second violent felony offender, admitted to a prior attempted burglary conviction; in fact, at the time of her guilty plea, defendant Green was already serving a separate nine-year term.

All three defendants also received highly favorable deals that enabled them to plead guilty to reduced charges in full satisfaction of multi-count accusatory instruments (see Callahan, 80 NY2d at 280 [noting that "relevant factors" in assessing an appeal waiver include "the nature of the agreement" and "the reasonableness of the bargain"]).  Defendant Thomas—who was charged with gang assault and criminal possession of a weapon, among other things—was promised the legal minimum sentence of five years of incarceration in connection with his guilty plea, though he faced a minimum determinate sentence of eight years on the top count.  Defendant Green, who faced up to fifteen years on each of the three charged class C felonies, was promised a cap of six years of incarceration in connection with her guilty plea.  And defendant Lang, who confessed to sexually abusing a 5 year-old girl, a 7 year-old girl, and a 12 year-old girl, faced up to seven years of incarceration on

each of his four charged felonies, but his plea capped his sentence at four years of incarceration.  On these records, defendants cannot plausibly contend that their appeal waivers were not knowingly, intelligently, and voluntarily entered.

III.

The majority's analysis, by contrast, invalidates two of the three waivers—taken by the same judge—based on the trial court's so-called "serious" mischaracterization of the right to appeal (majority op at 20).  Employing a kitchen sink approach, the majority takes issue with a number of the trial court's statements, including its suggestion that defendants' waivers would (1) operate as "an absolute bar to the taking of a direct appeal," (2) result in a "loss of attendant rights to counsel and poor person relief," and (3) impact defendants' "postconviction relief separate from the direct appeal" (majority op at 20).  Because none of these purported errors affected the voluntariness of defendants' waivers, none of them warrant reversal.

A.

With respect to the first asserted error, the majority itself acknowledges that we have "upheld appeal waivers" even though they were "elicited through court colloquies suggesting an absolute bar to review" (majority op at 13).  As the majority concedes, even the term "appeal waiver" can "misleadingly suggest a monolithic end to all appellate rights" since "no appeal waiver serves as an absolute bar to all claims" (Garza v Idaho, 586 US __, 139 S Ct 738, 744 [2019]).  That broad, unqualified terminology nonetheless persists (see majority op at 11), appearing in practically every oral colloquy and written

waiver form.  Because the phrasing does not undermine voluntariness, we have held that "[a]ppeal waivers using such shorthand pronouncements are enforceable" (majority op at 12).

This Court has also addressed—and rejected—the majority's second stated error as a basis for invalidating an appeal waiver (see People v Ramos, 7 NY3d 737 [2006]).  In Ramos, for instance, the written waiver form informed the defendant that, in connection with his waiver of the right to appeal, he was "giving up" a number of related appellate rights—including the right "to prosecute an appeal as a poor person," the right to "have an attorney assigned," and the right "to submit a brief and/or argue before an appellate court on any issues relating to [his] conviction and sentence" (Bradshaw, 18 NY3d at 270 [Read, J., dissenting] [quoting the Ramos written waiver]).  Despite the clear implication—that an appeal waiver surrenders the "attendant rights to counsel and poor person relief" (majority op at 20)—we upheld the "detailed written waiver" (Ramos, 7 NY3d at 738).  The reason, yet again, stems from our focus on the defendant; because defendant "knowingly, intelligently and voluntarily waived his right to appeal" (id.), his waiver remained valid.[1]

---

[1] The written waiver in Thomas, upheld today, similarly advised defendant that the right to appeal—which he expressly waived—is accompanied by various related rights:  the right "to prosecute the appeal as a poor person, to have an attorney assigned in the event that the defendant is indigent, and to submit a brief and argue before the appellate court on any issue relating to the conviction or sentence" (see appendix for defendant-appellant in People v Thomas).

Even the Model Colloquy—blessed by the majority as a "solid reference for a better practice" (majority op at 22)—identifies the rights to counsel and poor person relief as components of the right to appeal:

> "An appeal is a proceeding before a higher court, an appellate court.  <u>If a defendant cannot afford the costs of an appeal or of a lawyer, the state will bear those costs.  On appeal, a defendant may, normally through his/her lawyer argue that an error took place in this court which requires a modification or reversal of the conviction.</u>"

(NY Model Colloquies, Waiver of Right to Appeal [emphasis added].)  Promptly thereafter, the Model Colloquy reminds defendants that they are "giving up" the lion's share of their appellate rights:  "As a result [of the appeal waiver], the conviction by this plea and sentence will normally be final" (<u>id.</u>).  Here, by invoking the trial court's reference to the "rights to counsel and poor person relief" as a basis for reversal (majority op at 20), the majority simultaneously discredits the Model Colloquy and tacitly overrules <u>Ramos</u>.[2]

The third error identified by the majority is a new one: the trial court's purported misstatements concerning the effect of defendants' waivers on "postconviction relief separate from the direct appeal"—namely, on "collateral" challenges available in "state and federal courts" (majority op at 20-21).  Though we have never said so, the majority asserts that none of these avenues of postconviction relief may be waived (<u>see</u> majority op

_____

[2] Moreover, as a practical matter, a valid waiver of the right to appeal dramatically limits the scope of counsel's available arguments—and the nature of the representation that a defendant should expect—since defense counsel is never required to "make unsupportable arguments" on a defendant's behalf (<u>Garza</u>, 586 US at __, 139 S Ct at 746 n 8; <u>see also</u> Rules of Professional Conduct [22 NYCRR 1200.0] rule 3.1).

at 13-14, 14 n 3), and based on that novel conclusion, determines that the trial court's

contrary suggestion was flawed (see majority op at 20-22).

The breadth of that holding is troubling. CPL 440.10, our primary postconviction

relief statute, contains no fewer than 10 grounds on which a defendant may move to vacate

his conviction (see CPL 440.10 [1]; see also People v Tiger, 32 NY3d 91, 98-99 [2018]).

The federal habeas corpus scheme is similarly broad, enabling defendants to assert any

"violation of the Constitution or laws or treaties of the United States" (28 USC § 2254;

Jones v Cunningham, 371 US 236, 243 [1963] [noting that the writ of habeas corpus "is

not now and has never been a static, narrow, formalistic remedy"]). Given the breadth and

diversity of collateral claims available in both state and federal court, the impact of an

appeal waiver on a defendant's postconviction remedies is a complex and consequential

decision—and one that we had not, until today, resolved.

Still more disturbing, the issue has never been argued by any of the parties in these

appeals.[3] That should come as no surprise; these cases do not present the issue of whether

any, let alone all, collateral claims may be validly waived. Rather, defendants seek only to

restore their direct appeals and, as a result, they do not address the availability (or

waivability) of any collateral claims. Apart from the obvious reviewability problems—we

---

[3] In challenging the voluntariness of their waivers, defendants never relied on the trial court's discussion of collateral remedies. Even when expressly asked, defense counsel in both Lang and Green identified only those portions of the waiver colloquy discussing the right to counsel and the right to poor person relief; neither defendant adopted an argument concerning the waivability of the countless collateral claims available in state and federal court (see oral argument tr at 25-26, 34-35, 52-54).

generally do not consider arguments not raised by the parties (see People v Tapia, 33 NY3d 257, 270 n 8 [2019])—we are left with a complete absence of any briefing or argument that would enable the Court to reach an informed, considered, and well-reasoned decision. Undeterred, the majority decides the issue—and adopts a sweeping rule—in a handful of conclusory sentences: An appeal waiver, the majority states, relinquishes "*only*" those claims that "can be reviewed on direct appeal," and accordingly, waiver colloquies should never mention "collateral or federal relief" (majority op at 13-14, 14 n 3, 20-22 [emphasis added]).

Even a brief examination of that holding reveals deep flaws. With respect to State remedies, at least four of the collateral claims housed in CPL 440.10 are expressly reserved for those defendants convicted at trial (see CPL 440.10 [1] [c] [claim that "(m)aterial evidence adduced at a trial" was known to be "false"] [emphasis added]; id. 440.10 [1] [d] [claim that "(m)aterial evidence adduced by the people at a trial" was "procured in violation of the defendant's rights under the constitution"] [emphasis added]; id. 440.10 [1] [f] [claim of "(i)mproper and prejudicial conduct" that "occurred during a trial"] [emphasis added]; id. 440.10 [1] [g] [claim that "(n)ew evidence" was discovered after "a verdict of guilty after trial"] [emphasis added]). A fifth provision imposes a heightened standard on defendants "convicted after a guilty plea" as compared to those defendants "convicted after a trial" (CPL 440.10 [1] [g-1]). We evaluated a sixth provision in People v Tiger (32 NY3d 91 [2018]), where we held that the defendant's guilty plea—coupled with a waiver of the "right to appeal all aspects of th[e] case" (id. at 104 [Garcia, J., concurring])—foreclosed

her subsequent assertion of an "actual innocence" claim under CPL 440.10 (1) (h) (id. at 102-103). Evidently, an appeal waiver, coupled with a guilty plea, necessarily restricts a defendant's collateral remedies by foreclosing those grounds for relief predicated on a conviction at trial. In fact, in People v Hidalgo, the trial court expressly informed the defendant that, as a result of her appeal waiver, she could not "come back to this Court or to any court to set aside [her] conviction" (Maracle, 19 NY3d at 930 [Graffeo, J., dissenting] [quoting the Hidalgo waiver colloquy] [emphasis added]). Despite its apparent reference to collateral remedies, the defendant's waiver was upheld.[4]

With respect to collateral attacks in federal court, it is crystal clear that a defendant may validly waive the right to seek federal habeas corpus relief: "[E]nforceable waivers can preclude not only the right to direct appeal but also the right to collaterally attack the conviction in a habeas or other petition" (Rodriguez v Conway, 2010 WL 92911, *4 [ED NY 2010] [holding that the petitioner, a state defendant, "knowingly waived his right to appeal" and "his right to collaterally attack the conviction in federal court"]). The majority's contrary holding is not only wrong, it is effectively meaningless; a defendant's waiver of federal habeas rights is evaluated not under state standards, but under "the recognized federal standard of being knowing and voluntary" (Cross v Perez, 823 F Supp 2d 142, 148 [ED NY 2011] [emphasis added]). Under that approach, trial courts are not

---

[4] The majority correctly notes that a guilty plea, by itself, operates to forfeit a number of collateral claims (majority op at 14 n 3). A valid appeal waiver might *also* operate to relinquish *additional* collateral remedies in state court; indeed, in federal court, it has that precise effect (see infra). We have never evaluated the effect of an appeal waiver on any collateral claim. Now, given the majority's holding, we never will.

only permitted to explain the impact of a defendant's waiver on his collateral remedies, they are *required* to do so (see id.).

Given these repercussions, it would be prudent—not "erroneous" (majority op at 21)—for trial courts to advise defendants that their appeal waivers will impact their collateral remedies. Ironically, had the trial court in these cases failed to advise defendants of the broad ramifications of their waivers, defendants might have plausibly (and perhaps successfully) asserted a voluntariness argument on the basis that they failed to appreciate their waivers' full scope. The majority's holding now precludes trial courts from delivering those accurate warnings.

B.

Even if the trial court's colloquy was, in fact, misleading, the court's overbroad description of defendants' waivers would still not require their invalidation. As an initial matter, had defendants actually been misled by a literal interpretation of their appeal waivers, they would have never filed these appeals—and none of these cases would be here. In any event, an otherwise valid waiver is not rendered involuntary simply because the defendant was willing to waive *more* rights than required (see People v Rudolph, 21 NY3d 497, 502-503 [2013] ["If anything, defendant pleaded guilty under the impression that the law was less favorable to him than we have held that it is—in other words, the plea offer he accepted may have been better than he thought. That is not a misapprehension that would support an application to withdraw a plea."]; see also Garza, 586 US at __, 139 S Ct at 749-750 [noting that "even the broadest appeal waiver does not deprive a defendant

of all appellate claims"]).  While any nonwaivable issues purportedly encompassed by a waiver will be excluded from its scope, the balance of the waiver remains valid and enforceable (see People v Henion, 110 AD3d 1349, 1350 [3d Dept 2013]; People v Neal, 56 AD3d 1211, 1211 [4th Dept 2008]; see also Callahan, 80 NY2d at 282 [holding that "a bargained-for waiver of the right to appeal is ineffective to the extent it impairs the defendant's ability to obtain appellate review" of unwaivable claims] [emphasis added]).

Notably, these defendants do not seek to raise claims that might fall beyond the scope of a valid waiver.  Rather, they seek appellate review of the trial court's suppression ruling (Thomas), sentencing determination (Green), and denial of youthful offender status (Lang)—claims that are entirely waivable and that, here, were validly waived.  By way of example, during defendant Green's waiver allocution, the court stated:  "Do you understand that [appeal] waiver goes to almost all issues of conviction and sentence, including the terms and length of your sentence, whether your sentence is excessive . . . ?" Defendant responded:  "Yes, sir."  She now seeks to raise an excessive sentence claim.

Nor is the majority's analysis properly anchored in Billingslea (majority op at 20)— a case involving an *under*inclusive waiver (6 NY3d 248 [2006]).  There, the trial court conflated the distinct concepts of forfeiture and waiver, inaccurately informing the defendant that his appeal waiver was an automatic consequence of his guilty plea (id. at 254). As a result, the record failed to demonstrate that the defendant grasped the full range of claims he had relinquished through his waiver, rendering the waiver involuntary (id. at 257).  Here, by contrast, each waiver made clear that the right to appeal is "separate and

distinct," and defendants fully appreciated the breadth of claims validly encompassed by their waivers.  Armed with that knowledge, defendants voluntarily agreed to waive those rights—and then some.

IV.

In lieu of voluntariness, then, the majority's holding is premised on an entirely different standard—one that focuses solely on the trial court to the exclusion of the defendant.  Tellingly, the majority's analysis contains little discussion of these defendants; it makes no mention of defendants' backgrounds, plea deals, or discussions with counsel (see majority op, section III).  The majority effectively eliminates defendants from the inquiry altogether, instead resorting to harsh criticism of the trial court's colloquy as "muddled," "confused," "conflated," "incorrect," "improper," and "erroneous" (majority op at 18, 20-21).  The touchstone of that inquiry is the conduct of the trial court—not its impact on the defendant.

This shift in emphasis works a change in our law.  Our standard is premised not on a review of the trial court's colloquy in a vacuum, but on the defendant's grasp of the relinquished rights.  Rather than asking whether defendants acted knowingly, intelligently, and voluntarily, the majority asks whether the trial court's description of the waiver contained a "serious" mischaracterization of the right to appeal or was otherwise "incorrect and irredeemable under the circumstances" (majority op at 16, 20).  That novel standard elevates the court's colloquy over the defendant's state of mind, neglecting the centerpiece

of voluntariness review.  Not only does the majority's approach run counter to decades of settled precedent, it leaves lower courts with an unfamiliar and undefined new framework.

The majority's punitive tone is particularly jarring in light of our clear advisement that the "better practice" is for trial courts to "define the nature of the right to appeal more fully" (Sanders, 25 NY3d at 342).  A broader, more inclusive colloquy, we reasoned, serves to protect defendants from unwittingly abandoning vital appellate rights (see People v Maracle, 19 NY3d 925, 928-929 [2012]).  Indeed, we have admonished trial judges to more thoroughly explain the rights surrendered by an appeal waiver in order to ensure that defendants appreciate their far-reaching implications (see DeSimone, 80 NY2d at 283; Sanders, 25 NY3d at 342).

Meanwhile, we continue to craft a maze of rules for trial courts to navigate.  Our cases have generated an evolving, non-exhaustive list of appellate claims that can never be waived—a list susceptible to continued amendment (see Seaberg, 74 NY2d at 9).  Indeed, defendant Thomas's brief purports to list 18 additional appellate claims that survive a valid waiver (see brief for defendant-appellant in People v Thomas).  And despite our promise of "no mandatory litany" (e.g. Johnson, 14 NY3d at 486), our cases continue to suggest "standard procedure[s]" for trial courts to adopt (majority op at 14 [discussing Lopez, 6 NY3d 248]).  The rules are constantly changing, and our cases hardly lend themselves to a clear procedure.

The result has been predictable: more expansive waiver colloquies, couched in cautionary language, designed to impress upon defendants the breadth and significance of

the rights encompassed by an appeal waiver. Reinforcing that approach, we have upheld a number of these padded waivers, opting to overlook technical inaccuracies aimed at emphasizing the broad scope of the right to appeal (see majority op at 11-17; see also Nicholson, 6 NY3d at 257; Ramos, 7 NY3d at 738; Hidalgo, 91 NY2d at 734-737). With respect to appeal waivers, our message to trial courts has been consistent and clear: say more, not less.

The majority's message today is the opposite: say less, not more. In each of these three cases, the trial court went to great lengths to impress upon the defendant that a waiver of the right to appeal is important, expansive, and should not be taken lightly. That approach has now been condemned. The result is an unfortunate one: waivers will only be less knowing, less intelligent, and less voluntary.

V.

The ramifications of today's holding will be substantial and, more importantly, detrimental to defendants. Initially, the majority's assertion that its holding is a classic application of our established standard will, by itself, generate widespread repercussions (see majority op at 2, 17). Any waiver resembling those in Green and Lang is now prone to attack, and any defense attorney who failed to challenge its terms is vulnerable to a claim of ineffective assistance of counsel (see CPL 440.10 [1] [h]). And because the majority insists that it has not announced a new rule, its holding applies even to those cases that have already become final (see People v Baret, 23 NY3d 777, 783-784 [2014]).

The majority's holding also unsettles plea bargains in a manner that will harm the public, the courts, and ultimately, defendants. Like guilty pleas, appeal waivers serve the laudable goals of certainty and finality, allowing for "prompt resolution of criminal proceedings with all the benefits that enure from final disposition" (Seaberg, 74 NY2d at 7; Tiger, 32 NY3d at 101). But plea agreements, like all other contracts, depend on consistency and predictability in their enforcement (see J. Zeevi & Sons v Grindlays Bank [Uganda], 37 NY2d 220, 227 [1975]; see also United States v Riggi, 649 F3d 143, 147 [2d Cir 2011] [noting that plea agreements are construed "according to contract law principles"]). We therefore counsel against judicial upending of the bargain reached at the conclusion of the parties' negotiations (Oppenheimer & Co. v Oppenheim, Appel, Dixon & Co., 86 NY2d 685, 695 [1995]), opting instead to enforce the terms of the parties' negotiated agreement (Seaberg, 74 NY2d at 10; see also People v Avery, 85 NY2d 503, 507 ["Conditions imposed as part of a plea arrangement are valid if the parties agree to them and they do not violate any statute or contravene public policy"]). "[B]argains fairly made," we stressed, "should signal an end to litigation, not a beginning" (Seaberg, 74 NY2d at 10; see also Tiger, 32 NY3d at 100-101).

Today's holding unravels defendants' bargains and undermines the finality of their convictions. That result serves only to "disadvantage[] the public by allowing defendants to relitigate issues that they waived in exchange for substantial benefits" (Garza, 586 US at __, 139 S Ct at 755 [Thomas, J., dissenting]; see also Seaberg, 74 NY2d at 10 [recognizing the "public interest concerns" that are "served by enforcing waivers of the

right to appeal"]).  It also enlarges the caseload of our already burdened appellate courts, who must address the new appeals authorized by today's decision (Garza, 586 US at __, 139 S Ct at 755 [Thomas, J., dissenting]).[5]

---

[5] Judge Wilson asserts that, "in the real world," appeal waivers "fail to advance the State's interest in finality" because appellate challenges to the validity of appeal waivers consume the time and resources of appellate courts and advocates (see J. Wilson concurring/dissenting op, section III).  But his anecdotal evidence omits the most significant statistic: the tens of thousands of cases where defendants decline to pursue an appeal as a direct result of their waivers.  Accurately presented, the empirical evidence demonstrates that appeal waivers continue to serve the goals of finality and judicial economy that we recognized in Seaberg.  In 2018, nearly 37,000 felony cases were resolved by guilty plea in Supreme Court and County Court, but only 2,870 of those cases were later addressed by the Appellate Division (see New York State Unified Court System 2018 Annual Report, Court Structure and Caseload Activity).  Accepting the premise that appeal waivers are a "standard" component of plea deals (People v Batista, 167 AD3d 69, 81 [2d Dept 2018] [Scheinkman, P.J., concurring]), these statistics tell us that fewer than 8% of defendants opt to pursue an appeal once they have waived their appellate rights.  Put differently, in more than 92% of cases, appeal waivers operate exactly as they were intended.

There is no reason to believe that these revealing statistics are the result of pure coincidence (see Spriros A. Tsimbinos, The State of Appellate Division Caseloads, 70-JAN NY St BJ 33, 34 [1998] [attributing the "steep decline in criminal appeals" to the increasing "utilization of the waiver of appeal" as a result of "the Court of Appeals decision in People v Seaberg"]).  Judge Wilson's contrary suggestion—that defendants would "not appeal their convictions" even in the absence of an appeal waiver (J. Wilson concurring/dissenting op at 13-14 n 6)—is both unsupported and counterintuitive.

Nor is there any support for the speculative argument that, because appeal waivers have become "virtually universal," no additional consideration is provided to defendants in exchange for an appeal waiver (brief for amicus curiae The Legal Aid Society in People v Thomas; accord J. Wilson concurring/dissenting op at 9-10).  In fact, the opposite conclusion is at least equally plausible: universal appeal waivers are universally compensated with more favorable plea deals—such as a four year maximum prison term for sexually assaulting three children.

Perhaps worst of all, by depriving the prosecution of the benefit of its bargain, the majority introduces considerable uncertainty into the plea bargaining process. Without the guarantee of finality that an appeal waiver once promised, a prosecutor's incentive to offer generous plea deals is dramatically diminished (see Seaberg, 74 NY2d at 10 ["the negotiating process serves little purpose if the terms of a 'carefully orchestrated bargain' can subsequently be challenged"] [citation omitted]). Here, for instance, defendants Green and Lang, who faced lengthy terms of incarceration on their respective burglary and sexual abuse charges, will retain their reduced sentences (among other benefits), even though they have been relieved of their earlier promise to restrict further litigation. Going forward, a negotiating prosecutor will understandably consider that—notwithstanding a defendant's appeal waiver—limitless appeals might still ensue. In turn, the "very real" benefit of a waiver, a valuable bargaining chip for defendants, will be discounted (see United States v Teeter, 257 F3d 14, 22 [1st Cir 2001] ["Allowing a criminal defendant to agree to a waiver of appeal gives her an additional bargaining chip in negotiations with the prosecution"]). In other words, appeal waivers will no longer operate as a secure means of "providing a prompt conclusion to litigation," nor will they serve the "worthy objectives" we once celebrated (majority op at 8, 10). Terms offered to defendants may well reflect that new landscape as prosecutors adjust for increased risk. Ultimately, defendants will pay the price.

People v Victor Thomas
People v Nicole Green
People v Storm U Lang

Nos. 87, 88, 89

WILSON, J. (dissenting in <u>People v Thomas</u>; concurring in result in <u>People v Green</u> and <u>People v Lang</u>):

The game is not worth the candle. That is not to say this is a game: for many defendants, the harsh and chilling effect of appellate waivers results in the deprivation of

- 1 -

their constitutional and statutory rights, far from anything one could, other than with great irony, call a game. Rather, our Court's tortured jurisprudence on appellate waivers has wreaked havoc on the lower courts, district attorneys, defense counsel and defendants, and is not worth any of the hypothetical benefits purportedly bestowed by appellate waivers.

Since People v Seaberg, 74 NY2d 1 (1989), we have held that an appeal waiver is enforceable so long as the defendant has agreed to it knowingly, voluntarily and intelligently.   There, we offered that appellate waivers provide a means "where, by mutual concessions, the parties may obtain a prompt resolution of criminal proceedings with all the benefits that enure from final disposition" (id. at 7). We observed that the "final and prompt conclusion of litigation is an important goal," "provided that the settlement is fair, free from oppressiveness, and sensitive to the interests of both the accused and the People" (id. at 8). We noted that there was no public policy precluding defendants from waiving their rights to appeal, and that the "validity of the waiver is supported by the interests supporting plea bargains generally" (id. at 10). At the same time, Seaberg recognized that some claims – not itemized in our decision – could not be waived because those claims "embrace the reality of fairness in the process itself" (id. at 9).

The reality, however, is that appeal waivers have so corrupted the integrity of the process that, as our jurisprudence now stands, it is the rare appellate waiver that is fully knowing, voluntary and intelligent.   The foundational justifications on which Seaberg relied to sanction appellate waivers are painfully absent in all three cases before us.   Those waivers were not "fair," "free from oppressiveness," or "sensitive to the interests of both

the accused and the People." I therefore dissent as to People v Thomas; I concur in result

as to People v Green and People v Lang.

I.

The waivers at issue here were incapable of providing the defendants any

meaningful knowledge as to the rights they were waiving.  The knowing, voluntary and

intelligent test works tolerably well in its original context: plea bargaining.  There, a

defendant must learn the precise terms of the offered sentence, and weigh that against the

potential benefits and costs of going to trial.  As regards the sentence received, our

jurisprudence has been circumspect in ensuring that every detail of that sentence is

identified clearly (see e.g. People v Catu, 4 NY3d 242, 244 [2005] ["the court must advise

a defendant of the direct consequences of the plea"]; People v Louree, 8 NY3d 541, 545

[2011] ["a plea cannot be knowing, voluntary and intelligent if a defendant is ignorant of

a direct consequence" of his plea]; People v Peque, 22 NY3d 168, 197 [2013] ["a

noncitizen defendant convicted of a removable crime can hardly make 'a voluntary and

intelligent choice among the alternative courses of action open to the defendant' unless the

court informs the defendant that the defendant may be deported if he or she pleads guilty,"

citing People v Ford, 86 NY2d 397 (1995)]; People v Estremera, 30 NY2d 268 [2017]).

Transported by Seaberg to appellate waivers, however, the test sheds painfully little light

on whether a defendant knows the rights waived, comprehends them intelligently, and

makes a voluntary decision to abandon them. Two principal reasons account for that

failure.  First, in sharp contrast to the terms of a sentence, we have expressly held that no

itemization of the appellate rights waived is required (People v Lopez, 6 NY3d 248, 256 [2006] ["a trial court need not engage in any particular litany when apprising a defendant pleading guilty of the individual (appellate) rights abandoned"]; People v Sanders, 25 NY3d 337, 341 [2015]; see also majority op at 11).  In practice, no such itemization is given.  Second, for the typical criminal defendant, grasping the weight of the term of a sentence is fathomable; grasping the weight of the waived and unwaived appellate rights is not.  Indeed, I feel confident that most criminal lawyers (and judges, myself included) could not produce a comprehensive list of the waivable and unwaivable rights without conducting substantial research – let alone assess the value of those rights in the context of a particular case.

The prospect that appeal waivers might be knowing, voluntary and intelligent is further eroded because we are attempting to measure whether the defendant "knows" something, has an "intelligent" basis to assess it, and makes a "voluntary" choice based on factors completely external to the defendant.  We review the trial transcript, the colloquy of the court, the written waiver provided by the prosecutor.  The defendant's own voice is conspicuously lacking.  We test middle-school students about their knowledge of American history by asking them to recite facts and dates, not by giving them the correct answers and instructing them to answer "yes."  We test prospective citizens similarly.  But with criminal defendants, we verify their knowledge (and intelligence and voluntariness)  based on monosyllabic answers they are instructed by counsel to deliver, coupled with a signature on a form in a situationally coercive environment, where the entire plea – not just the

appellate waiver – may be jeopardized should the defendant say he or she does not understand the rights forfeited or their import (see Seaberg, 74 NY2d at 8). Stark is the contrast between the reality of Seaberg, where no colloquy occurred, and the language espoused in cases following it, which have emphasized "the responsibility to oversee the process and to review the record to ensure that defendant's waiver of the right to appeal reflects a knowing and voluntary choice" (see e.g. People v Callahan, 80 NY2d 273, 280 [1992]).

An appellate waiver is effective only when "a defendant has a full appreciation" of its consequences, and a defendant "must comprehend" that the appellate waiver is separate and distinct from the plea (People v Bradshaw, 18 NY3d 257, 264 [2011]).[1] When the courts themselves spout misleading and incorrect information as they did in Thomas, Green, and Lang, courts will be hard pressed – even if they engage in in-depth colloquies – to ensure the "full appreciation" and "comprehension" of defendants.[2] Perhaps it is the reality that a judge cannot truly determine whether the defendant knows the rights waived

---

[1] Moreover, because appellate waivers are "ritualistic devices" included in every plea agreement as discussed in Part II, a judge will face a herculean task in making sure a defendant fully comprehends that an appellate waiver is "separate and distinct" from the plea.

[2] Presiding Justice Scheinkman of the Second Department has suggested that even describing these agreements as "appellate waivers" makes them more difficult for the average defendant to comprehend fully. "It would seem more likely to be comprehensible to one without formal legal training, and substantially less inconsistent, to identify the limitation on appeal issues as being what it is – a limitation – from the outset, rather than having to explain that an appeal may be taken notwithstanding the 'waiver' of appeal just executed moments earlier" (People v Batista, 167 AD3d 69, 80 [2nd Dept 2018] [Scheinkman, P.J., concurring]).

and their import that has resulted in the labyrinth of contradictions comprising our appellate waiver jurisprudence.

As the majority acknowledges, the language of the waivers in all of the cases before us was either "incorrect" in <u>Thomas</u> (majority op at 18) or "mischaracterized" in <u>Lang</u> and <u>Green</u> (majority op at 2). Query, from a defendant's perspective, why a "mischaracterized" statement by a court results in an invalid waiver, but an "incorrect" one does not, or what meaning the majority ascribes the difference between the two. I agree with the majority that "the muddled nature of the court's advisements" cannot be ignored in <u>Lang</u> and <u>Green</u> (majority op at 20), where the trial court told the defendants that there would be "no review by any other court." I also agree with the majority that where even a reviewing court would struggle to understand the rights surrendered by an appellate waiver, we cannot expect defendants or their attorneys to "grasp the nature of the rights they are surrendering" (majority op at 20-21). I part ways with the majority as to its conclusion in <u>Thomas</u>. The court told Mr. Thomas that he was waiving his right "to challenge to a higher court what is taking place right now, the plea and what will take place in about two weeks when you are sentenced, to challenge those proceedings to a higher court." In the context of assuring that a defendant has knowingly, voluntarily and intelligently waived certain appellate rights, I see no difference between a judge telling a defendant that there will be no review by any other court and telling a defendant that he cannot challenge any of the current or future proceedings in a higher court, especially when that colloquy is coupled with a waiver that states the defendant is waiving his right to file a notice of appeal. As in <u>Green</u> and

Lang, a reviewing court would struggle to discern whether Mr. Thomas understood the rights he waived.[3]

By choosing to differentiate these cases, the majority further ensnares this Court in our Daedalean maze. As the majority acknowledges (majority op at 16), we have struck down waivers when a lower court advised the defendant that he could not take the case to a higher court (see People v Billingslea, 6 NY3d 248 [2006]; People v Bradshaw, 18 NY3d 257 [2011]) – but, the majority says, those situations were distinguishable because "under the circumstances" those defendants could not have known the distinct appellate rights they were surrendering, while here Mr. Thomas surely did. Under our current case law, the "nature and terms of the agreement and the age, experience and background of the accused" may allow a trial court to determine that a waiver remained voluntary, knowing and intelligent (Seaberg, 74 NY2d at 11), despite its internal contradictions and inconsistencies. Even the most experienced defendant would struggle under the facts at issue in Thomas. A judge told Mr. Thomas that he was waiving his right to appeal, explicitly telling him that meant he could not challenge his plea or sentence in a higher court; next, he signed a written waiver form which said at once both that he was waiving "any and all rights to appeal including the right to file a notice of appeal … with the exception of any constitutional

---

[3] In the alternative, the Appellate Division held that the hearing court properly denied Mr. Thomas's suppression motion because the "detective's act of showing defendant an incriminating photograph was, under the circumstances, a permissible response under People v Rivers to defendant's demand to know why he was being arrested" (citations omitted). Because I conclude that Mr. Thomas's case falls squarely within our holding in People v Ferro (63 NY2d 316 [1984]), I disagree.

speedy trial claim which may have been advanced, the legality of the sentence, my competency to stand trial, and the voluntariness of this plea and waiver" and that he had waived his right to "appeal and to file a notice of appeal." Those inconsistencies alone prevent Mr. Thomas's waiver from being knowing and intelligent.

Our totality-of-the-circumstances jurisprudence – in addition to supplying an excuse for courts to uphold inherently contradictory waivers – reflects a bizarre and unintended additional punishment for repeat offenders. Those who have been previously convicted or exposed to the system are, without any empirical evidence that this is so, determined to be more "intelligent" about the appeal waiver and more likely to have "knowingly and voluntarily" waived their right to appeal, as a consequence of their "age, experience, and background" (id.), while first-time offenders will have an easier time of representing their waiver as unknowing. Perhaps, instead, their experience has taught them only that our maze is inescapable.

II.

In addition to the above problems inherent in determining the state of mind of a layperson about rights we offer in a coercive setting and we fail to enumerate, appellate waivers run afoul of Seaberg's foundation in a fundamental way. Seaberg sanctioned appellate waivers as means "where, by mutual concession, the parties may obtain a prompt resolution of criminal proceedings with all the benefits that enure from final disposition" (Seaberg, 74 NY2d at 7). Laudable as that objective is, both ends of the presumed bargain have failed in the real world. As I set out in Part III, appellate waivers have not resulted in

<u>Seaberg</u>'s finality panacea.  More importantly, appellate waivers are not – and have long since ceased to be – "mutual concessions," resulting in outcomes "sensitive to the interests of both the accused and the People" (<u>id.</u>).

The <u>Seaberg</u> Court was able to dispose of the theory that appellate waivers are *per se* invalid – and the related one, that appellate waivers chill defendants from effectuating their rights – only by relying on the premise that plea bargains are ultimately a voluntary process that a defendant is free to accept or reject (see <u>Bordenkircher v Hayes</u>, 434 US 357, 363 [1978]; Robert K. Calhoun, <u>Waiver of the Right to Appeal</u>, 23 Hastings Const L Quarterly 127, 149 [1995]).  History and experience have undermined <u>Seaberg</u>'s core. Our thirty years of experience under <u>Seaberg</u> demonstrates that however voluntary the plea bargain itself is, no additional consideration is provided to defendants in exchange for an appeal waiver.  For appeal waivers, there are no "mutual concessions."

Instead, something quite distasteful and unseemly happens.  The government, in the form of prosecutors and the courts, receives immunity for harmful errors[4] it has made, while defendants are expected, almost without exception, to waive their right to appeal upon pleading guilty.  Appeal waivers have become a "purely ritualistic device" – they are "standard" and "part and parcel of plea bargaining" (<u>People v Batista</u>, 167 AD3d 69, 81 [2018] [Scheinkman, P.J., concurring]).  Due to their constituent nature, defendants do not receive a lesser sentence because of them.  If they did, we would not have situations like

---

[4] If the errors were harmless, the harmless error doctrine would dispose of them, without resort to an appeal waiver.

those before us – frequently occurring in my review of cases – in which the appellate waiver was sprung upon a defendant after the plea bargaining had been completed (see e.g. Green). The underlying rationale for both the majority here and in Seaberg can survive only if there is true voluntariness for the bargain between the People and the defendant who is waiving his or her right to appeal and only if the plea and waiver are bargained separately. A contract in which one party gives nothing is void for want of consideration. Because defendants receive no benefit in exchange for the appeal waiver, defendants are often rendered victims of "situational coercion" by these automatic, non-bargained-for waivers.

This is particularly true where defendants are giving up a fundamental right, specifically that of error correction, while the government benefits from that lack of review. In a prototypical example, a defendant seeks to suppress evidence that was unlawfully obtained. Erroneously, the court denies suppression. The defendant is now offered a much higher plea deal with a mandatory appellate waiver but sees no other feasible way to proceed: she must either agree to that plea or proceed to trial without the inculpatory evidence suppressed. The prosecutor and the court have thus effectively inoculated their error in denying suppression from appellate review. As the First Department stated in People v Ventura, although the "powers of a prosecutor may indeed be broad," they are "not so broad and limitless as to include the power to exact waivers of as fundamental a right as the right to appeal" (139 AD2d 196, 205 [1988]). The history since Seaberg illustrates what the Court in Seaberg did not see then: appellate waivers insulate courts from error review. As such, appellate waivers should be *per se* invalid, even on Seaberg's

own reasoning, because they result not from fair bargaining but from an unjust process that leads defendants compulsorily to accept waivers, foreclosing the system's obligation to review for prejudicial errors.

Our jurisprudence on appellate waivers affects more than just the rights of defendants: it impinges on the right of the public to a system that includes appellate review. The right to appeal is a fundamental right (see e.g. Ventura, 139 AD2d at 205; Melancon, 972 F2d at 577, citing Griffin v Illinois, 351 US 12, 18-18 [1956]). Moreover, in New York, the duty of appellate courts to entertain "all appeals from final judgments in criminal cases' is of constitutional dimension" (Callahan, 80 NY2d 273, 284 [1992]). The United States Supreme Court has recognized that defendants have "a right to a[n appellate] proceeding" regardless of whether they signed an overbroad waiver (see Garza v Idaho, 139 S Ct 738, 747 [2019]). We must then view our decisions in these cases as having utmost significance: it is a right of every New Yorker to have an honest process by which criminal defendants are convicted and their cases reviewed by a higher court. That right is diminished where this Court prevents the full review of errors that occur at trial, errors for which the government is responsible.[5] Why should the public trust a system in which the process is not open to examination by a court capable of further consideration? "It is essential that the system not only be fair but that it be perceived as fair" (Calhoun, Waiver

---

[5] Everyone agrees that our court systems are over-burdened. We should all agree then that "a decision of three people with time for reflection over the decision of one person with little or no time to think" should be preferred (Judith Resnik, Precluding Appeals, 70 Cornell L Rev 603, 620 [1985]; see also Calhoun, Waiver of the Right to Appeal, at 165). Five, had they time, would be still better. We should all want such error review.

of the Right to Appeal, at 178).   Because the right to appeal assures defendants and the

public that there is an available corrective process – one outside the hands of a single judge

– it is that right which ultimately allows the system to be perceived as fair.

Yet despite its fundamental importance, our Court has repeatedly approved of

overbroad appellate waivers – waivers in which it is not clear that the defendants, the

prosecutors or the courts knew the full extent of the rights waived.   That result is

incongruous with a fair criminal justice system.   The cases before us today are deeply

troubling because they reveal that which is not brought before us: the innumerable cases

which never make it to any appellate court.   When a defendant is told, as Ms. Green and

Mr. Lang were, that they cannot appeal to "any other court," or when a defendant signs a

form that forbids the filing of a notice of appeal, as Mr. Thomas did, mere fortuity brings

that case to our notice.   In innumerable other cases, after being explicitly told by a judge

or advised by an attorney that she cannot file an appeal or that there will be no further

review of her case, a defendant will simply not file an appeal and not seek review.   This

prevents defendants from effectuating their rights, even when those rights are legally

unwaivable.   Although "an agreement to waive appeal does not foreclose appellate review

in all situations" (Callahan, 80 NY2d at 284), the broad and impenetrable language in

appellate waivers "discourages defendants from filing notices of appeal even when they

have claims that cannot be waived, such as one concerning the lawfulness of the waiver or

the plea agreement itself" (People v Santiago, 119 AD3d 484, 486 [1st Dept 2014]).

Because such language deprives a court of the "very jurisdictional predicate it needs as a

vehicle for reviewing the issues that survive the waiver," (Callahan, 80 NY2d at 284), and chills defendants from enforcing their rights, appellate waivers should never be valid.

## III.

As if that was not enough to make appellate waivers worthy of abandonment, the *raison d'etre* of appeal waivers – finality – does not justify their existence. In Seaberg, Callahan, and again in People v Lopez, 6 NY3d 248 (2006), we stressed the importance of "holding [a] defendant to the plea and sentence bargain he or she made . . . in order to accomplish the goals of fairness and finality" (id. at 262).  We even held that "waivers *advance* that interest, for the State's legitimate interest in finality extends to the sentence itself and to holding defendants to bargains they have made" (Seaberg, 74 NY2d at 10) (emphasis added).  Those are nice theories.  What happens in the real world?  Appellate waivers not only fail to advance the State's interest in finality, they have become a "pathway to future litigation" (Batista, 167 AD3d at 78), largely due to the failure inherent in a test designed to determine knowledge, intelligence and voluntariness in a coercive situation with amorphous and inconsistent guidelines susceptible to various interpretations.[6]

---

[6] Judge Garcia in his partial dissent concludes that appellate waivers "operate exactly as they were intended" because just 8% of defendants appeal after waiving their appellate rights (Garcia, J., concurring/dissenting op at 20 n 5). My colleague's analysis lacks essential information: the fraction of defendants who pled guilty and did not appeal their convictions pre-Seaberg.  Moreover, Judge Garcia's suggestion that Seaberg resulted in a "steep decline in criminal appeals" is not supported by the data in the article he cites. Putting aside that the article reflects the first four years post-Seaberg, not the quarter century since then, the proposition that Seaberg – a ruling with statewide effect – was the

To be clear, when we have said "finality," what we really mean is cost.  For the centuries before Seaberg authorized appeal waivers, every criminal prosecution in New York came to a final conclusion.  "Finality" is just the cost savings associated with avoiding one level of appellate review.[7]  Surely, cost to taxpayers must be taken into account, but we should recognize it for what it is, instead of calling it "finality" to raise the specter of endless litigation.  We also must recognize that we are balancing that cost against the actual and perceived fairness of the criminal justice system.[8]

Post-Seaberg, that balance becomes quite easy to calculate, because on one side there is fairness and public confidence, and on the other side there is less than nothing.  Appellate waivers create more litigation than they avoid.  As the Second Department noted,

---

primary driver of the decline in the number of appeals between 1992-1996 is incompatible with the same article's data showing "significant" increases in the number of criminal appeals in the Third and Fourth Departments, including an increase of over 50% in the Third Department (id.; see Spriros A. Tsimbinos, The State of Appellate Division Caseloads, 70-JAN NY St BJ 33, 35 [1998]).  Indeed, that article notes that the "number of felony indictments in New York City have [sic] dropped some 21% since 1990 [and] [s]imilar decreases in counties outside of New York City have also occurred."  It goes on to say that the drop in criminal appeals from 1992 to 1996 was 18% – less than the drop in felony indictments beginning in 1990.  That is, the reduction in indictments alone would account for the drop in appeals, which appears quite likely because of the increase in the Third and Fourth Departments post-Seaberg.

[7] Appeals to this court are largely discretionary; we grant approximately 1.5% of the criminal leave applications before us – and that includes cases in which the validity of an appeal waiver is at issue (see 2018 Court of Appeals Annual Report, Appendix 8).

[8] Were appeal waivers abolished, either legislatively or judicially, we should expect cost savings in all the cases now appealed in which an appeal waiver exists.  Among the cases in which no appeal is now taken, there are four possible outcomes if appeal waivers are eliminated: (1) some will still not be appealed; (2) some will now be appealed and have merit; (3) some will now be appealed, the defendant will lose, but the law will be clarified; and (4) some meritless appeals will be taken.  Only (4) is an undesirable outcome, but the cost of disposing of a truly meritless appeal is quite small.

it is "far too often" that a "perfunctory appeal waiver colloquy serves only" to create further litigation because an appellate court is forced in its review of the case "to hold invalid a bargained-for waiver" (id.). In what Justice Scheinkman calls a "conservative estimate," in just the last few years, the Appellate Division has found at least 380 appeal waivers to be invalid (id. at 82 [Scheinkman, P.J., concurring]). Rather than conserving judicial resources, appellate waivers consume the time of prosecutors, defense counsel and the court in attempting to create a record that might satisfy our appellate waiver jurisprudence. All that time and effort would be saved were appellate waivers banned. On appeal, appellate waivers force intermediate appellate courts, not to mention advocates, to spend countless hours parsing through appellate waiver jurisprudence, trying to navigate the complexities of waivable and nonwaivable issues, and guessing at whether the defendants "fully comprehend[ed]" their waivers. And then, after all that time spent in such morass, the appeal waivers will often be found invalid and the merits of the case reached – the opposite of what Seaberg contemplated.

At argument, counsel for the People in Green and Lang confirmed that her office always briefs the merits even when there is an appeal waiver ("[W]e have no way of knowing for sure what's valid as a waiver of appeal, you also have to argue … the other issue"). In my experience, that is true statewide. Perhaps part of the People's motivation is to give appellate courts an easier way to decide appeals, because in many cases the appeal's lack of substantive merit is clearer than the validity of the appeal waiver. That

conclusion is evidenced in the many Appellate Division decisions ducking the question of a waiver's validity and addressing the merits of the appeal.

Thus, if you are an appellate judge in one of the Departments that does not spend hours attempting to assess the validity of each appellate waiver, you may be in one which ignores the waivers altogether and reaches the merits anyway. Presiding Justice Acosta notes that in the First Department, appellate waivers in excessive sentence cases "consume very little of our precious time," because the court decides the merits "without reaching the validity of any appeal waiver" (First Department Takes Different Approach to Appeal Waivers, NYLJ, Dec 7, 2018 at 1). Even there, then, appellate waivers waste attorney time and save no judicial time. Nor do they encourage finality as formulated by Seaberg; they are instead largely ignored. It is clear that appellate waivers generally fail to serve the cost-saving purpose that formed the basis for their justification. As mentioned, for the vast majority of our history as a state, we have not had appellate waivers. The parties, lawyers and courts managed just fine without them.

IV.

The majority observes that my dissent is based on "hypothetical constructs" drawn from outside the record (majority op at 9). So too was Seaberg. Seaberg's justifications for appellate waivers relied on sweeping public policy assumptions not contained anywhere in its record. No record evidence in Seaberg demonstrated that appellate waivers would conserve resources, avoid litigation, improve outcomes for the parties or would be knowingly, voluntarily and intelligently entered into in a noncoercive, freely bargained

exchange. Instead, those assumptions were based on good-faith judgments about extra-record facts. It is odd to suggest that this Court can make – and entrench – law based on such assumptions but cannot now overturn it if those assumptions have proven wrong.

In one case before us today, the Court approves of a waiver that provided "incorrect" information (majority op at 18). In two others, it disapproves of waivers that were "mischaracterized" (majority op at 2). Praise to the lower courts that can follow a string out of that maze, for it has only one exit: abandon Seaberg. The rule of Seaberg, while admirable in its notion of assuring fairness and saving costs, in practice attains neither of those goals. "Precedents remain precedents, however, not because they are established but because they serve the underlying 'nature and object of the law itself,' reason and the power to advance justice" (People v Bing, 76 NY2d 331, 338 [1990][citations omitted]). *Stare decisis* is a matter of policy choice, "not a mechanical formula of adherence to the latest decision" (id.). Here, appellate waivers have proved unworkable, they have created more questions than they resolve, and when viewed from the "cold light of logic and experience," they do not serve the ends of justice (see People v Peque, 22 NY3d 168, 194 [2013]). Seaberg's knowing, voluntary and intelligent test has resulted in many defendants' unknowing, unintelligent and involuntary waivers. It has produced – not avoided – vast amounts of additional effort in trial courts and litigation in appellate courts as they struggle to establish and determine, respectively, the validity of such waivers. And, ultimately, defendants are chilled from pursuing their fundamental rights to appeal, while the public's confidence in the system's fairness wastes away.

All I will say with regard to Judge Garcia's partial dissent is that I thank him for proving my case.

I do not, as the majority claims, "mistrust [] all players in the system" (majority op at 9). I trust that overworked prosecutors, overworked defense attorneys, overworked trial judges and overworked appellate judges are doing their level best to follow our tortured appellate waiver jurisprudence, which has unintentionally foisted on all of them additional work and cost, with no benefit, and with a further cost to some defendants who believe they have waived even unwaivable rights and therefore fail to pursue them. Is an excellent judicial system one that insulates errors from judicial review, or one that considers the merits of every claim of error? What if doing so would cost less, or even the same? I respectfully dissent in Thomas and concur in result in Green and Lang.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

For Case No. 87: Order affirmed. Opinion by Chief Judge DiFiore. Judges Stein, Fahey and Feinman concur. Judge Rivera concurs in result in an opinion. Judge Garcia concurs in result in a separate concurring opinion. Judge Wilson dissents in an opinion.

For Cases No. 88 and 89: Order reversed and case remitted to the Appellate Division, Fourth Department, for further proceedings in accordance with the opinion herein. Opinion by Chief Judge DiFiore. Judges Stein, Fahey and Feinman concur. Judge Wilson concurs in result in an opinion, in which Judge Rivera concurs in a separate concurring opinion. Judge Garcia dissents in an opinion.

Decided November 26, 2019